FARMERS GROUP, INC., a Nevada corporation; and Mid–Century Insurance Company, a California corporation, Petitioners and Cross–Respondents,

v.

Rodney Paul WILLIAMS and Jo Maria Gatewood, a/k/a/ Jo Maria Gatewood–Williams, individually and as husband and wife, Respondents and Cross–Petitioners.

No. 89SC552.

Supreme Court of Colorado,
En Banc.

Feb. 4, 1991.

Rehearing Denied Feb. 25, 1991.

Hall & Evans, Alan Epstein, Eugene O. Daniels, Arthur R. Karstaedt, Denver, for petitioners/cross-respondents.

Pryor, Carney and Johnson, P.C., Thomas L. Roberts, Englewood, Carol Gilman Ford, Denver, for respondents/cross-petitioners.

Fogel, Keating and Wagner, P.C., Timothy F. Devereux, William L. Keating, Den-

ver, for amicus curiae Colorado Trial Lawyers Ass'n.

Ireland, Stapleton, Pryor & Pascoe, P.C., William G. Imig, Mark W. Williams, Denver, for amicus curiae Nat. Ass'n of Independent Insurers.

Creamer & Seaman, P.C., Thomas J. Seaman, David P. Reiter, Denver, for amicus curiae Colorado Defense Lawyers Ass'n.

Justice ERICKSON delivered the Opinion of the Court.

We granted certiorari to review *Williams v. Farmers Insurance Group, Inc.*, 781 P.2d 156 (Colo.App.1989), which held that section 10–4–708(1), 4A C.R.S. (1987 & 1990 Supp.), did not provide the exclusive remedy against automobile insurers that refuse to pay benefits in bad faith, and that the burden of proving willful and wanton conduct under section 10–4–708(1) was by a preponderance of the evidence. We affirm.

On October 26, 1980, Rodney Williams and his common-law wife, Jo Maria Gatewood–Williams, were injured when a rock fell on their car during a snowstorm on Guanella Pass, Colorado. Williams notified his automobile insurance carrier, whose parent company was Farmers Group, Inc., of the accident and submitted claims for personal injury protection benefits under his policy. Farmers paid those claims for five months, but then ceased paying any benefits after the Williams refused to sign several releases and to undergo multiple examinations requested by Farmers. In September 1982, Williams filed a complaint against Farmers alleging breach of contract, that the breach was willful and wanton, extreme and outrageous behavior, and that Farmers committed the tort of bad faith breach of contract.

In December 1983, a jury returned a verdict in favor of Williams on the willful denial of personal injury protection benefits and tortious bad faith breach of contract, but denied Williams' claim for punitive damages for extreme and outrageous conduct. The jury awarded Williams contract benefits of $10,922, treble damages of $32,767 (as provided by Colorado's No–Fault Act), and compensatory damages on the bad faith tort claim of $350,000. In May 1984, the district court granted Farmers' motion for judgment notwithstanding the verdict. That ruling was overturned by the court of appeals in *Williams v. Farmers Insurance Group, Inc.*, 720 P.2d 598 (Colo.App.1985), which remanded the case with instructions that a different judge review Farmers' post-trial motions.[1]

A different trial court reinstated the jury verdicts, imposed interest, and awarded costs and attorney fees against the defendant insurers. The Colorado Court of Appeals affirmed, ruling that common-law bad faith remedies were not preempted by the No–Fault Act, and that the treble damages provision of the Act, section 10–4–708(1), was provable by a preponderance of the evidence rather than by a beyond a reasonable doubt standard. *Williams v. Farmers Ins. Group, Inc.*, 781 P.2d at 159–60. Williams' cross-appeal issues were not addressed.

We granted certiorari to review whether the No–Fault Act preempts tort claims against an automobile insurance company for bad faith breach of an insurance contract, whether willful and wanton conduct under section 10–4–708(1) must be proved beyond a reasonable doubt, and whether Williams as a cross-petitioner on certiorari was obligated to file a petition for rehearing in the court of appeals.[2]

1. The court stated that the trial court's order granting JNOV included statements of facts that were not offered at trial or contained in the record, but rather that the trial court's order had been prepared by defense counsel at the court's request and that there had been *ex parte* communications between the trial court and defense counsel. The court of appeals held that there was an appearance of impropriety and

remanded the case, without reviewing the merits, for another judge to determine Farmers' post-trial motions.

2. We requested, *sua sponte,* that the parties brief the issue of whether a petition for rehearing is required for a conditional cross-petition for certiorari.

## I

Farmers first argues that section 10–4–708(1) provides the exclusive remedy for an insured against the insurer for refusal to provide personal injury protection (PIP) benefits under the insurance contract.

Williams sought compensatory damages based on his assertion that Farmers had withheld his benefits in bad faith. In the context of insurance contracts, courts have established two standards of conduct by the insurer, depending on the type of benefit the insured is seeking to enforce. When the benefit derives from the insurer's duty to defend the insured against third-party actions, that relationship is characterized as a "third-party claim." A "first-party claim," on the other hand, results when the insured makes a claim against his insurer for benefits accruing directly from the insurance contract. *See* Klaus & Cahill, *Colorado's No–Fault Statute—Does It Bar Common Law Bad Faith Claims?*, 17 Colo.Law. 449 (1988).

We first recognized the tort of bad faith breach of insurance contracts in a third-party situation in *Farmers Group, Inc. v. Trimble*, 691 P.2d 1138 (Colo.1984). In *Trimble*, we said, "Particularly when handling claims of third persons that are brought against the insured, an insurance company stands in a position similar to that of a fiduciary." *Id.* at 1141. Because in a third-party claim the insurer retains the absolute right to control the defense of actions, we held that the standard applicable to establish the tort of bad faith is one of reasonableness. *Id.* at 1142.

In 1983, the court of appeals recognized a bad faith claim in a first-party situation. *Rederscheid v. Comprecare, Inc.*, 667 P.2d 766 (Colo.App.1983). In *Travelers Insurance Co. v. Savio*, 706 P.2d 1258, 1273–74 (Colo.1985), we held that an employee could bring a first-party claim against his employer's workers' compensation insurance carrier for tortious bad faith breach of contract. We said, however, that because in the first-party situation the insured did not cede any right to represent his interests to the insurer, the insurer's standard of care differed from an insurer in third-party circumstances. "[A] worker's compensation claimant who asserts that an insurer has failed to pay a claim in bad faith must establish that the insurer acted unreasonably *and* with knowledge of or reckless disregard for the fact that no reasonable basis existed for denying the claim." *Id.* at 1274 (emphasis added).

*Savio* rejected the insurer's argument that the Workers' Compensation Act afforded the employee his sole remedy and precluded common-law tort claims against insurance carriers. *Id.* at 1264–67. Although the Act provided exclusive remedies for injuries occurring while on the job, it did not provide remedies to the employee for the insurer's bad faith refusal to pay claims. *Id.*[3]

In 1973, the Colorado Auto Accident Reparations Act, also referred to as the No–Fault Act, was adopted. §§ 10–4–701 to –723, 4A C.R.S. (1987 & 1990 Supp.). Unlike the Workers' Compensation Act, Colorado's No–Fault Act does provide remedies for the injured insured against an insurance carrier that, in bad faith, does not pay personal injury protection benefits. Section 10–4–708(1) provides:

> In the event that the insurer fails to pay such benefits when due, the person entitled to such benefits may bring an action in contract to recover the same. In the event the insurer is required by such action to pay any overdue benefits, the insurer shall, in addition to the benefits paid, be required to pay the reasonable attorney fees incurred by the other party. The insurer shall pay interest on the benefits which were in controversy at a rate of eighteen percent per annum, with

3. The Act did authorize the insurance commissioner to suspend or revoke the license of any carrier that "intentionally, knowingly, or willfully" violated any of the provisions of the Act. § 8–44–106, 3 C.R.S. (1973) (repealed and substantially reenacted in 1983, §§ 8–53–116 to –118 and 8–53–128, 3B C.R.S. (1986)). Although this provision placed an insurance carrier that acted in bad faith at risk, it provided no remedy to the individual employee who was injured by the carrier's conduct.

interest commencing from the date the benefits in controversy were due. *In addition, in the event of willful and wanton failure of the insurer to pay such benefits when due, the insurer shall pay to the other party, in addition to the other amounts due to the other party under this subsection (1), an amount which is three times the amount of unpaid benefits in controversy in the action.*[4]

Our task is to determine whether the General Assembly intended section 10–4–708(1) to be the exclusive remedy for automobile insurer bad faith, thereby precluding a separate tort claim for bad faith breach of contract.[5]

### A

■ Our primary task in construing a statute is to give effect to the intent of the General Assembly. *People v. District Court*, 713 P.2d 918, 921 (Colo.1986). In this case, it is necessary to determine whether the General Assembly intended to abrogate all common law rights of action not specifically set forth in the statute. To discern that intent, a court should look first to the plain language of the statute. *Id.* Words and phrases should be given effect according to their plain and ordinary meaning, and "we must choose a construction that serves the purpose of the legislative scheme, and must not strain to give language other than its plain meaning, unless the result is absurd." *Colorado Dep't of Social Serv.'s v. Board of Comm'rs*, 697 P.2d 1, 18 (Colo.1985). Section 2–4–201(1)(b) and (e), 1B C.R.S. (1980), states it is presumed that a "just and reasonable intent is intended" and that the "[p]ublic interest is favored over any private interest" when a statute is enacted. Our task is to determine the legislative intent, and to construe the statute as a whole to give effect to all of its parts. *People v. Lee*, 180 Colo. 376, 506 P.2d 136 (1973); *Massey v. District Court*, 180 Colo. 359, 506 P.2d 128 (1973).

The No–Fault Act was enacted in 1973 to "avoid inadequate compensation to victims of automobile accidents; to require registrants of motor vehicles in this state to procure insurance covering legal liability arising out of ownership or use of such vehicles," and to provide benefits to persons occupying or persons injured in accidents involving such vehicles. § 10–4–702.

Farmers asserts that because "willful and wanton" and "bad faith" essentially describe the same behavior, the legislative remedy for willful and wanton refusal to pay personal injury protection benefits under the No–Fault Act preempts a tort claim for the same behavior. Farmers contends that when a statute creates legal duties and provides a particular means for enforcement, the designated remedies exclude all others, and cites as authority *Board of County Commissioners v. Moreland*, 764 P.2d 812 (Colo.1988); *Silverstein v. Sisters of Charity*, 38 Colo.App. 286, 559 P.2d 716 (1976); and *Farmers Group, Inc. v. Trimble*, 658 P.2d 1370, 1377–78 (Colo. App.1982), *aff'd on other grounds*, 691 P.2d 1138 (Colo.1984).

In *Moreland,* we held that when there was no preexisting common-law duty imposed on a county to ensure that building plans for a cabin included a guardrail around a deck, adoption of a building code requiring such a guardrail did not impose that duty absent "a clear expression of legislative intent to allow a civil liability remedy for breach of the obligations" imposed by that code. 764 P.2d at 812. Unlike *Moreland,* in which the county argued

---

**4.** (Emphasis added.) In 1989, the General Assembly amended section 10–4–708 to provide for mandatory arbitration in the event of an allegation that the insurer breached the insurance contract. Although this case falls under section 10–4–708 before the 1989 amendments, those changes do not affect our analysis.

**5.** Williams initially argues that "willful and wanton" and "bad faith" have separate meanings, but has failed to illustrate a circumstance

in which a willful and wanton refusal to pay insurance benefits would not also be bad faith conduct. If the refusal to pay was reasonable, then the treble damages provision of section 10–4–708 would not apply, and the insured would simply be paid the contract benefits owed him. For the purposes of this opinion, we conclude that willful and wanton behavior is synonymous with bad faith.

that the legislature did not intend to create a new duty, Farmers argues that the General Assembly intended to abrogate an existing common-law remedy for a breach of the insurer's duty not to withhold benefits in bad faith.

*Silverstein* involved a statute providing criminal sanctions for violations of rights and duties that were, as in *Moreland,* unknown at common law. *Silverstein,* 38 Colo.App. at 288–89, 559 P.2d at 718. The court of appeals concluded that the General Assembly could have authorized civil penalties for violations of the act, but "it chose to impose only a criminal sanction. Therefore, we have no authority to impose civil liability." *Id.* (citing *Quintano v. Industrial Comm'n,* 178 Colo. 131, 495 P.2d 1137 (1972) (failure of industrial commissioners to comply with their statutory duty to inspect factory not a basis for recovery absent a clear legislative intent to impose civil penalties). In *Trimble,* the court of appeals upheld a claim for relief based on bad faith breach of an automobile insurance contract, but stated that there was no private right of action for violations of the Unfair Competition–Deceptive Practices Act, §§ 10–3–1101 to –1114, 4A C.R.S. (1987 & 1990 Supp.), since the "statutory scheme [did] not expressly provide for or authorize a private civil remedy," and because there was no indication of contrary legislative intent. *Farmers Group, Inc. v. Trimble,* 658 P.2d at 1377–78. We did not address the private right of action question, but affirmed the court of appeals holding that evidence of intentional conduct was not necessary to establish the tort of bad faith breach of an insurance contract in the third-party situation. *Trimble,* 691 P.2d at 1142.

Unlike the foregoing cases, there is a preexisting common-law duty here imposed on an insurer, the breach of which results in tort liability. Although Farmers complains that the No–Fault Act created rights and duties unknown at common-law, the duty Williams seeks to enforce is the insurer's duty not to unreasonably withhold payment of benefits it is obligated to make under the insurance contract. That duty does not derive from the No–Fault Act, but

applies equally to any insurer whether the contract involves automobiles or not. *See, e.g., Savio,* 706 P.2d at 1273–74 (duty applies to workers' compensation insurance carrier). The question is not whether the General Assembly authorized a private right of action for a breach of duty it statutorily created, but whether the legislature meant to abrogate an existing common-law remedy when it enacted section 10–4–708(1).

Although section 2–4–211, 1B C.R.S. (1980), expressly grants the General Assembly the right to abrogate common-law remedies, "we will not lightly infer a legislative abrogation of that right absent a *clear* expression of intent." *Kristensen v. Jones,* 195 Colo. 122, 124, 575 P.2d 854, 855 (1978) (emphasis added); *see also Robinson v. Kerr,* 144 Colo. 48, 52, 355 P.2d 117, 119–20 (1960) (a statute modifies the common law "only to the extent embraced in the statute, which may not be enlarged by construction, nor its application extended beyond its specific terms. Statutes are not presumed to alter the common law otherwise than the act expressly provides.") (citations omitted); *Collard v. Hohnstein,* 64 Colo. 478, 479, 174 P. 596 (1918) ("To deprive plaintiff of his common law right of action it is essential that it affirmatively appear that the statutes themselves, either *directly or by necessary implication,* abrogate such a right." (emphasis added)); *Schuler v. Henry,* 42 Colo. 367, 378, 94 P. 360, 363 (1908) (Maxwell, J., dissenting) ("the common law will not be held to be abrogated unless the language used in the statute requires it."); *see also Federal Marine Terminals, Inc. v. Burnside Shipping Co., Ltd.,* 394 U.S. 404, 412, 89 S.Ct. 1144, 1149, 22 L.Ed.2d 371 (1969) ("the legislative grant of a new right does not ordinarily cut off or preclude other nonstatutory rights in the absence of clear language to that effect.").

As far back as 1887, in determining whether a statute providing a remedy to the owner of animals killed or maimed through a railroad employee's negligence preempted common-law tort actions, we stated that:

we cannot say that, in express terms or by clear implication, [the statute] repeals or suspends the common-law right of action mentioned. The statute is, in our judgment, simply cumulative. The object of the legislature was not to interfere with the owner's existing rights, but, owing to the difficulty of establishing negligence, to give him additional relief.

*Denver & Rio Grande R. Co. v. Henderson,* 10 Colo. 1, 2, 13 P. 910, 911 (1887). Thus it is obvious that in order for us to recognize an abrogation of the common-law remedy for tortious bad faith breach of an insurance contract, there must be a clear legislative intent to do so.

### B

It is undisputed that the plain words of section 10–4–708(1) do not eliminate or otherwise restrict common-law remedies. Nor are common-law remedies against an insurer for bad faith expressly abrogated in sections 10–4–713 ("No tort recovery for direct benefits") or 10–4–714 ("Limitation on tort actions"). Those sections specifically limit an injured person's right to bring a tort action against an "owner, user, or operator of a motor vehicle" or persons or organizations legally responsible for the acts of those persons, save for certain exceptions not relevant here. Claims against insurance companies for refusing to pay personal injury protection benefits, however, are not restricted.

In addition, there are no contemporaneous statements by individual legislators indicating an intent to abrogate the common law.[6] Common-law remedies against insurance companies were not referred to by any of the legislators in the tape recorded portions of the debates on House Bill 1027 (Colorado Auto Accident Reparations Act) or Senate Bill 200, an alternative defeated by the General Assembly. Farmers contends, however, that it was unnecessary for the General Assembly to address bad faith claims against insurance companies

because, at the time the No–Fault Act was adopted, Colorado had not recognized such claims for relief.

While it is true that at the time the No–Fault Act was adopted there was no Colorado case law on a tort action for bad faith breach of an insurance contract, there were common-law remedies against insurance companies for the damages caused for refusal to pay benefits unreasonably. We have permitted recovery for mental suffering when the conduct resulting in a breach of contract was willful and wanton. *See Fitzsimmons v. Olinger Mortuary Ass'n,* 91 Colo. 544, 17 P.2d 535 (1932) (breach of undertaking contract). In *Steen v. Aetna Casualty,* 157 Colo. 99, 101, 401 P.2d 254, 255 (1965), we declared that an insurer could be liable in tort if it was negligent and acted in bad faith. *Steen* was cited by the Colorado Court of Appeals in 1970 for the proposition that "a third party judgment creditor of an insured was not a real party in interest in a suit against the insurer based on the insurer's 'bad faith' breach of its responsibilities to its insured." *Bashor v. Northland Ins. Co.,* 29 Colo.App. 81, 85, 480 P.2d 864, 866 (1970), *aff'd, Northland Ins. Co. v. Bashor,* 177 Colo. 463, 494 P.2d 1292 (1972). *Bashor* implied that such a cause of action existed in Colorado.

In 1970, the claim at issue here was specifically recognized by California in *Fletcher v. Western National Life Insurance Co.,* 10 Cal.App.3d 376, 89 Cal.Rptr. 78 (1970):

It is well settled that [in California] punitive damages may not be recovered for breach of contract, even if the breach is willful, fraudulent or coupled with evil intent. . . . On the other hand, if the action is one in tort, punitive damages may be recovered upon a proper showing of malice, fraud or oppression even though the conduct constituting the tort also involves a breach of contract.

10 Cal.App.3d at 400, 89 Cal.Rptr. at 92–93. *Fletcher* held that the applicable statutory

---

**6.** Such statements are relevant to our inquiry into legislative intent. *Archer Daniels Midland*

*Co. v. State,* 690 P.2d 177 (Colo.1984).

provision limiting recovery to the amounts due under the policy did not apply when the action sounded in tort. *Id.* at 400–01, 89 Cal.Rptr. at 93.[7] At least thirteen other states had recognized similar remedies before 1973. *See,* Annotation, *Insurer's Liability for Consequential or Punitive Damages for Wrongful Delay or Refusal to Make Payments Due Under Contracts,* 47 A.L.R.3d 314, 319 (1973). Case law existed in 1973 to guide the General Assembly in limiting common-law remedies against insurance companies if that result was intended. Since the legislative record is silent, we conclude that the General Assembly did not intend to abrogate those remedies.

Further evidence of a lack of intention to abrogate the common law can be found in the Unfair Competition–Deceptive Practices Act. That Act provides statutory sanctions for insurance practices constituting unfair methods of competition and unfair or deceptive practices. § 10–3–1101. Even though the entire statutory scheme revolves around sanctioning insurers for prohibited acts, section 10–3–1114 declares, "Nothing in this part 11 shall be construed to create a private cause of action based on alleged violations of this part 11 *or to abrogate any common law contract or tort causes of action.*" (Emphasis added.) Section 10–3–1114 was added in 1987, and codified the court of appeals decision that there was no private right of action authorized by the Act. *Trimble,* 658 P.2d at 1377. Section 10–3–1114 specifically did not, however, abrogate the common-law tort remedy recognized by both the court of appeals and this court in *Trimble* and the cases that followed for the same conduct prohibited by the Act. That language does not square with Farmers' assertion that the General Assembly silently intended to abrogate the same rights in the No–Fault Act. Moreover, the General Assembly has amended the No–Fault Act several

times, the last being the arbitration requirement added to section 10–4–708(1) in 1989. Yet it has never indicated any intent to abrogate common-law remedies and limit the rights of the insured to recovering treble damages, even though the tort of bad faith breach of an insurance contract has been recognized in Colorado since at least 1983. *See Matter of Estate of Daigle,* 634 P.2d 71, 76 (Colo.1981) (when legislature reenacts a statute with similar language, it is presumed to have adopted past judicial constructions of that statute).

Farmers points to a number of appellate decisions from Illinois, in which the courts found that statutes similar to section 10–4–708(1) preempted common-law remedies. *See Tolbolt v. Allstate Ins. Co.,* 75 Ill. App.3d 57, 30 Ill.Dec. 824, 393 N.E.2d 1171 (1979). *But see Lynch v. Mid–America Fire & Marine Ins. Co.,* 94 Ill.App.3d 21, 49 Ill.Dec. 567, 418 N.E.2d 421 (1981) (statute allowing award of attorney fees plus statutorily defined penalty for vexatious and unreasonable refusal to pay benefits did not preempt punitive damages for the same behavior); *Ledingham v. Blue Cross Plan for Hosp. Serv. Corp.,* 29 Ill.App.3d 339, 330 N.E.2d 540 (1975) (relying on *Fletcher* to find that a right of action in tort existed for breach of duty of good faith and fair dealing), *rev'd on other grounds,* 64 Ill.2d 338, 1 Ill.Dec. 75, 356 N.E.2d 75 (1976); *Roberts v. Western–Southern Life Ins. Co.,* 568 F.Supp. 536 (N.D.Ill.1983) (statute did not preempt punitive damages). Although the issue involved in the Illinois cases is similar to the one here, the issue has not been resolved by the Illinois Supreme Court, nor do those cases provide guidance in determining what the Colorado General Assembly intended in 1973. *See UNR Indus., Inc. v. Continental Ins. Co.,* 607 F.Supp. 855, 866–68 (N.D. Ill.1984) (predicting Illinois Supreme Court will not find that statute preempts compen-

---

**7.** Other cases cited by *Fletcher* in support of the existence of an action for bad faith breach of an insurance contract included *Crisci Security Insurance Co. v. New Haven, Conn.,* 66 Cal.2d 425, 426 P.2d 173, 58 Cal.Rptr. 13 (1967) (California Supreme Court upholding award for mental damages for insurer violation of covenant of good faith and fair dealing and recognizing cause of action for bad faith breach of contract); and *Acadia, California, Ltd. v. Herbert,* 54 Cal.2d 328, ——, 353 P.2d 294, 299, 5 Cal. Rptr. 686, 690 (1960) ("An act that constitutes a breach of contract may also be tortious.").

satory damages for breach of covenant of good faith and fair dealing).[8]

Farmers also claims that if the General Assembly had not intended to abrogate common-law remedies, it would have specifically indicated that treble damages were not the exclusive remedy. As we have said, however, we do not look to whether the legislature specifically authorizes the continuance of preexisting common-law remedies when it enacts a statute dealing with the same issue, but rather to whether, "in express terms or by clear implication, [the statute] repeals or suspends the common-law right of action." *Denver & Rio Grande R. Co. v. Henderson,* 10 Colo. at 2, 13 P. at 911. We fail to find that clear implication here.

Finally, Farmers and *amici* submit that if bad faith claims are not preempted, there will be a resulting flood of litigation against insurers. All insurers in Colorado have been liable for tortious bad faith for several years and Farmers' predicted flood has not occurred. Even if Farmers is cor-

rect, however, it would not affect our decision. It is incumbent upon the General Assembly to decide whether public policy dictates a change in the common law, subject, of course, to constitutional limitations. Our sole task here is to determine what the legislature's intent was regarding common-law remedies when it enacted the No–Fault Act, not whether that intent or lack of it was wise.

Farmers argues that the General Assembly intended to limit automobile insurers' liability for bad faith breach of contract, but has not relied on legislative history or statutory language to support its claim. Without any basis for reaching such a conclusion, we decline to find by implication that the General Assembly intended such a serious result as abrogating a common-law remedy available to the public in favor of an insurance company's private interest. We hold that section 10–4–708(1) is cumulative to, and does not preempt, the common-law tort remedy for bad faith breach of an insurance contract.[9]

8. Farmers also relies on cases from states other than Illinois. In *Kewin v. Mass. Mutual Life Insurance Co.,* 409 Mich. 401, 295 N.W.2d 50 (1980), the Michigan Supreme Court did not recognize an independent tort of bad faith breach of a commercial contract, absent tortious conduct existing independent of the breach, although it later recognized that an insured could recover under a separate tort claim for intentional infliction of emotional distress. *Roberts v. Auto–Owners Ins. Co.,* 422 Mich. 594, 601–602, 374 N.W.2d 905, 908 (1985). As Justice Levin remarked in a separate opinion, "It makes little difference to the insured or an insurer whether mental distress damages are allowed as contract or tort damages." *Id.* at 620, 374 N.W.2d at 917. Unlike Michigan, Colorado recognizes the tort of bad faith breach of an insurance contract.

In *Milcarek v. Nationwide Insurance Co.,* 190 N.J.Super. 358, 463 A.2d 950 (1983), a New Jersey superior court held that the state's no-fault act, providing a 10% interest penalty on all overdue personal injury protection benefits, precluded a further award of punitive damages. *Id.* at 369, 463 A.2d at 956–57 (citing and rejecting *Fletcher* ). *Milcarek* relied on *Kewin; Haagenson v. National Farmers Union Property & Casualty Co.,* 277 N.W.2d 648 (Minn.1979) (intentional breach of contract or violation of no-fault statute does not constitute an independent tort); and *Smith v. Harleysville Insurance Co.,* 494 Pa. 515, 431 A.2d 974 (1981) (refusing to create a cause of action in tort to supplement

the Unfair Insurance Practices Act); *see also Gurnick v. Government Employee Ins. Co.,* 278 Pa.Super. 437, 420 A.2d 620 (1980).

In all of the above cases, the jurisdiction did not, unlike Colorado, recognize a separate tort for bad faith breach of an insurance contract, but were instead asked to create a new remedy not included in the relevant statutes. In addition, *Smith* and *Gurnick* have been somewhat limited by *Dercoli v. Penn. National Mutual Insurance Co.,* 520 Pa. 471, 554 A.2d 906 (1989), in which the Pennsylvania Supreme Court held that an automobile insurer did not have a duty of good faith and fair dealing with the insured.

Contrary to Farmers' contention, these cases do not support its conclusion. The question here is not whether Colorado recognizes a common-law tort remedy for bad faith breach of an insurance contract, but whether the Colorado General Assembly intended to abrogate that remedy when it enacted section 10–4–708(1).

9. This decision is not at odds with *Cingoranelli v. St. Paul Fire & Marine Insurance Co.,* 658 P.2d 863 (Colo.1983), in which we held that the release of one tortfeasor did not operate to release an automobile insurer from its obligations to pay personal injury protection benefits, absent a clear intention to the contrary. *Id.* at 869. In *Cingoranelli,* we said, "PIP claims are contractual claims which exist independently of tort liability...." *Id.* at 865. *Cingoranelli* comports with the notion that an insurer may be liable in contract under section 10–4–708(1) while at the

## II

■ Farmers contends that the treble damages provision of section 10–4–708(1) is punitive in nature and therefore falls under the requirement of section 13–25–127(2), 6A C.R.S. (1987), that all exemplary damages provided by section 13–21–102, 6A C.R.S. (1987), be proved beyond a reasonable doubt.[10] The court of appeals rejected that argument and found the proper standard of proof to be by a preponderance of the evidence. 781 P.2d at 160. The court said "[t]here is a distinction between the assessment of a statutory civil penalty and for exemplary damages." *Id.* We agree.

Section 13–21–102 provides that a jury *may* award exemplary damages if it finds certain criteria have been met, and that a judge may reduce or disallow exemplary damages if the deterrent effect of those damages has been accomplished, the conduct has ceased, or the purpose of the damages has otherwise been served. § 13–21–102(2)(a), (b), and (c). The plaintiff has no right to exemplary damages, which are in the sole discretion of the trier of fact. *See Montgomery Ward & Co. v. Andrews,* 736 P.2d 40 (Colo.App.1987). On the other hand, the treble damages award authorized in section 10–4–708(1) is mandatory once the plaintiff has met his burden of showing that the insurer's actions were willful and wanton. Nowhere in section 10–4–708(1) are treble damages referred to as "exemplary." In addition, all exemplary damages awarded under section 13–21–102 are limited to an amount equal to the amount of actual damages unless the defendant has continued the wrongful behavior during the pendency of the case or has acted in a willful and wanton manner during the pendency of the case that has further aggravated the plaintiff's damages. § 13–21–102(3)(a) & (b). The treble damages provision of section 10–4–708(1) clearly falls outside the scope of that provision since, once the conduct is proved, the treble damages award is automatic.

A California appellate court faced with the same argument regarding a treble damages provision of the San Francisco Administrative Code stated that calling the provision "punitive in nature" was "merely semantical and diversionary." *Kelly v. Yee,* 213 Cal.App.3d 336, 341, 261 Cal.Rptr. 568, 571 (1989). The distinction made in *Kelly* is that treble damages "promote effective enforcement of the ordinance on behalf of [the consumer], while punitive damages generally serve to deter the sort of extreme disregard for the rights of others that decent citizens should not have to tolerate." *Id.* at 341–42, 261 Cal.Rptr. at 572.

The treble damages provision in section 10–4–708(1) is more akin to the treble damages provision in federal antitrust law than it is to punitive damages. It is a statutory claim in a civil action. Thus the appropriate standard of proof is by a preponderance of the evidence. § 13–25–127(1).

## III

■ Finally, we requested *sua sponte* that the parties brief whether a cross-petition for review on certiorari may issue absent timely filing by the cross-petitioner of a petition for rehearing in the court of appeals.

C.A.R. 52(b) provides for the timely filing of a petition for rehearing pursuant to

---

same time being liable for a common-law tort if it has acted in bad faith. We caution, however, that an insured could not receive a double recovery for the same wrong under section 10–4–708(1) and through a tort action. A jury instruction to that effect would prevent a double recovery.

**10.** Section 13–21–102 provides in relevant part:
(1)(a) In all civil actions in which damages are assessed by a jury for a wrong done to the person or to personal or real property, and the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct, the jury, in addition to the actual damages sustained by such party, may award him reasonable exemplary damages. The amount of such reasonable exemplary damages shall not exceed an amount which is equal to the amount of the actual damages awarded to the injured party.

. . . .

(2) Notwithstanding the provisions of subsection (1) of this section, the court may reduce or disallow the award of exemplary damages. . . .

C.A.R. 40 as a jurisdictional requirement for a writ of certiorari to review a court of appeals judgment. *Wiggins v. People*, 199 Colo. 341, 608 P.2d 348 (1980). C.A.R. 52(b) does not, however, address the filing of a cross-petition for certiorari. That petition is addressed by C.A.R. 53(b), which provides, "Within ten days after the service of the petition, respondent may file and serve an opposition brief, a cross-petition or both...." There is no requirement that the cross-petitioner file a request for rehearing in the court of appeals before he files the cross-petition.

■ Williams cites *City of Delta v. Thompson*, 37 Colo.App. 205, 548 P.2d 1292 (1975), in support of his proposition that a petition for rehearing is not required for a cross-petition. In *Thompson*, the court rejected the argument that the prevailing party in the trial court would be required to file a motion for a new trial under C.R. C.P. 59(f) as it then existed to preserve for review by cross-appeal any adverse ruling by the trial court that would become important only if the appellate court reversed the judgment.

> This reading of the rules could result in the incongruous situation of a winning party being forced to file a motion for a new trial in order to insure that he could later file a notice of appeal, with the possibility that his motion for a new trial could be granted. Such an illogical and inefficient result cannot be countenanced by the judicial system.

*Id.* at 207, 548 P.2d at 1294. *Thompson*, however, stands only for the proposition that "an appellee may, without the filing of a motion for new trial or a notice of cross appeal, raise arguments in support of his judgment which would not increase his rights under the judgment, whether or not the trial court had ruled on those arguments." *Blocker Exploration v. Frontier Exploration, Inc.*, 740 P.2d 983, 989 (Colo. 1987) (quoting *Thompson*, 37 Colo.App. at 208, 548 P.2d at 1294–95). It is settled law that a respondent may defend the judgment of the trial court or the court of appeals on any ground supported by the record, so long as the party's rights are not increased under the judgment. *See, e.g., Smith v. Phillips*, 455 U.S. 209, 215 n. 6, 102 S.Ct. 940, 945 n. 6, 71 L.Ed.2d 78 (1982).

Here the cross-petition issues put forth by Williams could potentially increase his rights under the judgment, but only if we remand for a new trial. When a party who substantially prevails in the court of appeals files a conditional cross-petition for certiorari, requesting that we do not reach those issues unless we disturb the underlying judgment, it is equally illogical to require a petition for rehearing on those matters, and there is no requirement in either C.A.R. 52(b) or 53(b) that such a petition be filed. If a petition for rehearing were required, in this case Williams would have been forced to request that the court of appeals review issues it had not considered because it upheld the award for tortious bad faith. That result would be both illogical and inefficient. We hold that when, as here, a party files a conditional cross-petition for certiorari of issues not reached unless we disturb the underlying judgment, there is no requirement that the party first file a petition for rehearing in the court of appeals.

■ A different condition occurs, however, when the court of appeals has substantially ruled against both parties. For example, if the court of appeals had upheld the jury's verdict that Farmers breached its contract with Williams, but overturned the award of compensatory damages for tortious bad faith, both parties would have a substantial reason for seeking a writ of certiorari. Even if we upheld such a ruling, Williams' rights could be increased depending on our resolution of the tort issues. In such a case, whichever party is the petitioner depends entirely on which party filed the first petition. The other becomes the cross-petitioner by virtue of filing the second petition. Both parties, however, seek certiorari on adverse judgments regardless of our resolution of their opponent's petition. A logical reading of C.A.R. 52(b) requires both parties in that circumstance to request a rehearing by the court of appeals on those aspects of the

decision adverse to them. In order to preserve those issues for review in this court, a petition for rehearing must be filed in accordance with C.A.R. 40.

Because we have upheld the judgment in favor of Williams, the issues in his conditional cross-petition are moot.

Accordingly, the judgment of the court of appeals is affirmed.

LOHR, J., concurs in part and dissents in part.

VOLLACK, J., dissents and ROVIRA, C.J., joins in the dissent.

Justice LOHR concurring in part and dissenting in part:

I concur in parts II and III of the majority's opinion. Because I believe that the plain language of section 10–4–708(1), 4A C.R.S. (1987 & 1990 Supp.), provides the exclusive remedy for the insured against the insurer who refuses to pay benefits in bad faith, I respectfully dissent from part I of the majority opinion.

Justice VOLLACK dissenting:

I respectfully dissent from the majority's holding that the common-law bad faith remedy was not preempted by the No–Fault Act, and that the treble damages allowed under the Act, § 10–4–708(1), 4A C.R.S. (1987 & 1990 Supp.), were not punitive and were thus provable by a preponderance of the evidence. In my opinion, the legislature preempted the common-law bad faith remedy by providing an exclusive remedy in contract to cover the same behavior of willful and wanton refusal to pay personal injury protection (PIP) benefits.

The Colorado Auto Accident Reparations Act (the No–Fault Act) is a statutory creation in derogation of the common law. The legislature, in adopting the No–Fault Act, devised a comprehensive scheme for providing mandatory first-party insurance benefits to persons injured in automobile accidents, without regard to fault. It is a system created entirely by statute and, at the time of its enactment, was unknown at common law. In enacting the statute, the legislature contemplated the potential for

factual disputes and provided express remedies in favor of the insured for the wrongful delay in payment. Section 10–4–708(1) provides in part:

In the event that the insurer fails to pay such benefits when due, the person entitled to such benefits may bring an action in contract to recover the same. In the event the insurer is required by such action to pay any overdue benefits, the insurer shall, in addition to the benefits paid, be required to pay the reasonable attorney fees incurred by the other party. The insurer shall pay interest on the benefits which were in controversy at a rate of eighteen percent per annum, with interest commencing from the date the benefits in controversy were due. In addition, in the event of willful and wanton failure of the insurer to pay such benefits when due, the insurer shall pay to the other party, in addition to the other amounts due to the other party under this subsection (1), an amount which is three times the amount of unpaid benefits in controversy in the action.

The majority holds that remedies under the No–Fault Act are not exclusive. I disagree. In 1973, the Colorado legislature created new concepts that did not previously exist at common law in providing coverage under the No–Fault Act. One of the main issues prior to the No–Fault Act was the hardship on injured parties to pay medical expenses prior to completion of litigation. The inability of injured parties to pay medical expenses in many cases forced unsatisfactory settlements. To correct this inequity, the legislature established the statutory framework creating a legal obligation for insurers to provide PIP benefits without regard to fault. PIP claimants were also provided with a direct claim for relief in contract with specific remedies against an insurer who willfully and wantonly denies or withholds PIP benefits.

Bad faith by an insurer falls within one of two standards of conduct based upon the position of the insured in relation to the insurer. When third parties bring claims against an insured, the insurer has full control to investigate, negotiate, settle, and

provide a defense. The insurer assumes a quasi-fiduciary relationship. *Farmers Group, Inc. v. Trimble*, 691 P.2d 1138 (Colo.1984). On the other hand, the insured, in filing a claim for PIP benefits against the insurer, becomes a first-party claimant, and both parties act pursuant to the contractual duties and obligations flowing between them. In first-party claims, the insured is on a more equal footing with the insurer than in third-party claims. Klaus & Cahill, *Colorado's No–Fault Statute—Does It Bar Common Law Bad Faith?*, 17 Colo.Law. 449 (1988).

Next, we should consider whether the standard of care required in third-party claims is the same as in first-party claims. We have stated that with third-party claims "the standard of conduct of an insurer in relation to its insured in third-party claims must be characterized by the general principles of negligence." *Trimble*, 691 P.2d at 1142. A less difficult burden is required in third-party claims because of the quasi-fiduciary relationship between an insurer and its insured. With regard to first-party claims for bad faith conduct by an insurance carrier, we held in a worker's compensation context that a "claimant who asserts that an insurer has failed to pay a claim in bad faith must establish that the insurer acted unreasonably and with knowledge of or in reckless disregard for the fact that no reasonable basis existed for denying the claim." *Travelers Ins. Co. v. Savio*, 706 P.2d 1258, 1274 (Colo.1985).

Moreover, in 1987 the legislature enacted section 10–3–1113, 4A C.R.S. (1987), which provides:

**Information to trier of fact in civil actions.** (1)(a) In any · civil action for damages founded upon contract, or tort, or both against an insurance company, the trier of fact may be instructed that the insurer owes its insured the duty of good faith and fair dealing, which duty is breached if the insurer delays or denies payment without a reasonable basis for its delay or denial.

(b) Under a policy of liability insurance, the determination of whether the insurer's delay or denial was reasonable shall be based on whether the insurer's delay or denial was negligent.

(c) Under a policy of first-party insurance, the determination of whether the insurer's delay or denial was reasonable shall be based on whether the insurer knew that its delay or denial was unreasonable or whether the insurer recklessly disregarded the fact that its delay or denial was unreasonable.

(d) In determining whether an insurer's delay or denial was reasonable, the jury may be instructed that willful conduct of the kind set forth in section 10–3–1104(1)(h)(I) to (1)(h)(XIV) is prohibited and may be considered if the delay or denial and the claimed injury, damage, or loss was caused by or contributed to by such prohibited conduct.

In my opinion, the enactment of section 10–3–1113 codified previous case law and clearly sets a different standard of conduct for first-party and third-party insurance actions. Standards established for third-party actions do not apply in PIP benefit claims. Section 10–4–708(1) provides for the insured in first-party claims, entitling him to a contract action for failure to pay benefits when due and, in addition to recovery of benefits due, entitling him to attorney fees and interest at a rate of eighteen percent per annum from the date the benefits were due. The statute further provides as a remedy for bad faith[1] in the form of willful and wanton failure to pay benefits when due, an award of three times the amount of the unpaid benefits. The treble-damage award goes to the manner of the breach, rather than the breach itself.

The provisions of section 10–4–708(1) meet the generally adopted rationale, "Where a statute creates legal duties and provides a particular means for their enforcement, the designated remedy excludes

---

**1.** The majority concludes for the purpose of this opinion that willful and wanton behavior is synonymous with bad faith. Maj. op. at 422.

all others." *Silverstein v. Sisters of Charity*, 38 Colo.App. 286, 288, 559 P.2d 716, 718 (1976). At the time the No–Fault Act was adopted there was no Colorado law on tort action for bad faith breach of insurance contract. Maj.op. at 424. The No–Fault Act, which established PIP coverage, imposed new statutory duties upon insurance companies writing automobile policies, requiring them to promptly pay medical benefits. Failure to pay reasonable and necessary PIP benefits could result in a contract action and the recovery of compensatory and punitive damages, as provided by section 10–4–708(1). In my opinion, this is the kind of statutory duty and remedy referred to in *Silverstein*. Since, at the time of the adoption of the No–Fault Act, no common law claims of bad faith breach of contract existed in Colorado, it was not necessary to include express language preempting such remedies. To the contrary, where a statute creates legal duties which were nonexistent at common law, and provides particular means for their enforcement, the designated remedy is exclusive, and courts should not imply new remedies to accompany a new right in the absence of some legislative indication, or other circumstances, that such a result was intended. *American Television and Communication Corp. v. Manning*, 651 P.2d 440 (Colo.App.1982). In the absence of strong indicia of legislative intent to the contrary, courts are compelled to conclude that the legislature provided precisely the remedies it considered appropriate. *Holter v. Moore and Co.*, 681 P.2d 962 (Colo.App. 1983).[2] In my opinion, a plain reading of section 10–4–708(1) provides an exclusive remedy for breach of contract, nullifying subsequent common-law remedies which would provide double recovery.

I disagree with the majority conclusion that the treble damages of section 10–4–

708(1) are not punitive and that the burden of proof necessary is only a preponderance of the evidence. The express language used in section 10–4–708(1) and section 10–3–1113(1)(c) to establish a willful, wanton, or reckless breach of contract tracks the language of section 13–21–102, 6A C.R.S. (1987), regarding exemplary damages, requiring a beyond-a-reasonable-doubt burden of proof as required in section 13–25–127(2), 6A C.R.S. (1987).

I would reverse the judgment.

I am authorized to say that Chief Justice ROVIRA joins in this dissent.

---

2. The legislature has further reinforced the exclusive remedy by amending § 10–4–708(1.5), 4A C.R.S. (1989), to provide in part:
   (1.5) Any action for breach of contract brought pursuant to subsection (1) of this section shall proceed to binding arbitration pursuant to the following provisions[.]
   Logic dictates that the legislature would not mandate such detailed procedures if the Act's

breach of contract remedy was not intended to be exclusive. The majority's conclusion that § 10–4–708(1) is cumulative to and does not preempt the common-law tort remedy for bad faith breach of insurance contract would bring about multiple litigation for the same claim for relief in different forums with double recovery.