Steven **PARFREY** and Deborah Parfrey, Plaintiffs–Appellants,

v.

**ALLSTATE INSURANCE COMPANY,** an Illinois corporation, Defendant–Appellee.

No. 89CA1376.

Colorado Court of Appeals, Div. IV.

Jan. 17, 1991.

As Modified on Denial of Rehearing Feb. 21, 1991.

Certiorari Granted Sept. 9, 1991.

Salmon, Godsman & Nicholson, P.C., David Levy, Englewood, for plaintiffs-appellants.

Zupkus & Ayd, P.C., Robert A. Zupkus, Diane Murley, Denver, for defendant-appellee.

Opinion by Judge DAVIDSON.

After an automobile accident involving an underinsured motorist, plaintiffs, Steven and Deborah Parfrey, filed this action against defendant, Allstate Insurance Company, alleging that Allstate, as their insurance carrier, was negligent in failing to offer them higher uninsured/underinsured motorist coverage as required by § 10-4-609(1) and (2), C.R.S. (1987 Repl.Vol. 4A). The trial court granted summary judgment to Allstate on the grounds that Allstate had fulfilled its statutory duty by offering this coverage to the plaintiffs when they originally purchased their policy. Plaintiffs appeal, contending that the entry of summary judgment was error. We reverse and remand.

The following facts are not in dispute. In March 1985, the Parfreys purchased automobile insurance for their newly-leased Toyota and their Volkswagen from Allstate's agent Doug Townsend. At this time, the Parfreys purchased bodily injury (BI) liability coverage at $25,000 per person/$50,000 per occurrence (25/50) and uninsured/underinsured motorist (UM/UIM) liability coverage at the same level.

Later that month, the Parfreys informed Townsend that the leased vehicle required additional liability coverage and, as a result, the BI liability coverage on this vehicle was increased to $50,000 per person/$100,000 per occurrence (50/100). The level of UM/UIM coverage remained at 25/50.

Then, after Townsend was contacted by the lienholder on the leased vehicle, the BI limits were increased again for this vehicle to $100,000 per person/$300,000 per occurrence (100/300).

The following November the Parfreys added a truck to their policy with BI cover-

age at 100/300 and UM/UIM coverage at 25/50. One year later, in November 1986, Steven Parfrey was injured by the negligence of an underinsured motorist while driving this truck. The Parfreys allege it was at this time that they first learned that their UM/UIM coverage was less than their BI liability coverage.

The Parfreys then filed a claim against Allstate asserting the following: (1) Allstate had violated § 10–4–609(2) by failing to offer them higher UM/UIM coverage when they were issued their policy, when they increased their BI coverage, or when they added a new vehicle to their policy, and (2) Allstate was vicariously liable for the negligent acts or omissions of its agent, Townsend. After limited discovery, Allstate moved for summary judgment.

The trial court held that, as a matter of law, § 10–4–609, C.R.S. (1987 Repl.Vol. 4A) only required Allstate to make a one-time offer to plaintiffs to purchase UM/UIM liability coverage. The trial court apparently reasoned that proof that Allstate had fulfilled its statutory duty was demonstrated by the fact that plaintiffs initially selected minimum UM/UIM coverage. Therefore, as it found no genuine issues of disputed fact, the trial court granted summary judgment to Allstate.

The Parfreys appeal, contending that the trial court's interpretation of the statute was incorrect and that, therefore, the entry of summary of judgment against them was error.

## I.

Plaintiffs first argue that before an insurance policy is issued, § 10–4–609(2) requires insurers to provide consumers with detailed information concerning their right to purchase higher UM/UIM coverages. Plaintiffs allege that, since they were not given this information by Allstate, they were not given an opportunity to make an informed decision regarding whether to purchase this insurance which would have compensated them for their injuries. Plaintiffs also argue that, even if Allstate's initial offer of optional UM/UIM coverage was sufficient, Allstate was required to

renew this offer when plaintiffs made material changes to their policy by increasing their BI limits and adding a new vehicle.

The issues presented by plaintiffs are ones of first impression for this court. Specifically, we must address what type of offer is required by § 10–4–609(2), C.R.S. (1987 Repl.Vol. 4A) and whether, pursuant to § 10–4–609(3), C.R.S. (1987 Repl.Vol. 4A), Allstate was required to make any further offer of higher coverage after plaintiffs changed the terms of their initial policy.

## A.

■ We must first consider the nature of the offer required by 10–4–609(2). When plaintiffs were issued their policy in 1985, the present statutory provision was in effect and stated: "Prior to the time the policy is issued or renewed, the insurer shall offer the named insured the right to obtain higher limits of uninsured motorist coverage ... but in no event shall the insurer be required to provide limits higher than the insured's bodily injury liability limits or [$100,000] per person and [$300,-000] per accident, whichever is less." Section 10–4–609(2), C.R.S. (1987 Repl.Vol. 4A).

Although it is undisputed that this section mandates that the insurer offer the optional coverage, the statute does not specify the form or manner in which the insurer must make this offer. Plaintiffs argue that when the policy was originally issued, Allstate had a duty to explain fully that their UM/UIM coverage could be increased if they increased their BI limits. On the other hand, Allstate argues that § 10–4–609(2) only requires insurers to inform insureds in general terms that this coverage is available.

Because, in our view, the statute is ambiguous regarding the nature of the offer required, we must determine its meaning by construing the statute as a whole, in light of the legislative purpose it was designed to accomplish. *See Dodge v. Department of Social Services*, 657 P.2d 969 (Colo.App.1982).

The General Assembly first enacted legislation designed to protect individuals from uninsured motorists by adopting the Motor Vehicle Financial Responsibility Act in 1965. As stated in Colo.Session Laws 1965, ch. 91 at 334, its purpose in adopting this act was to:

> "*induce and encourage* all motorists to provide for their financial responsibility for the protection of others, and to assure the widespread availability to the insuring public of insurance protection against financial loss caused by negligent financially irresponsible motorists." (emphasis added)

The current statute providing protection against uninsured motorists also reflects this same intent. In enacting § 10-4-609(1), the General Assembly provided that an insurer must offer uninsured motor vehicle coverage and that the minimum amount of uninsured coverage will be automatically extended to the insured unless this offer is rejected in writing. *Alliance Mutual Casualty Co. v. Duerson,* 184 Colo. 117, 518 P.2d 1177 (1974).

In 1983, upon the repeal and reenactment of this statute with amendments, the General Assembly added several new sections and, in so doing, provided that uninsured motorist coverage shall also cover damages resulting from underinsured motorists. Section 10-4-609(4) C.R.S. (1987 Repl.Vol. 4A).

The discussion in the General Assembly regarding underinsured coverage indicates that the purpose of requiring insurance companies to offer this protection was to ensure that consumers were made aware not only that UM/UIM coverage was available for a minimal cost, but also that purchase of this coverage was necessary in order to protect themselves in the event they were injured by an underinsured motorist.

The intent to have insurers inform consumers fully regarding the need to purchase UM/UIM liability coverage is also demonstrated by other statutory provisions. As previously stated, § 10-4-609(1) requires that rejection of the minimum amount of uninsured coverage must be in writing. Thus, the insured must take affirmative action to disavow such coverage before it will be deemed denied.

Furthermore, § 10-4-609(3), C.R.S. (1987 Repl.Vol. 4A) states that only "after *selection of limits* by the insured or the exercise of the option not to purchase the coverages [in] this section" will the insurer be relieved of the need to renew this offer in any renewal or replacement policy. (emphasis added) To "select" is defined as "to take by preference from among others." *Black's Law Dictionary* 1219 (5th ed. 1979). As such, this subsection requires that the insured be given a choice of options from which to choose.

Moreover, to grant the insured the right to make a selection of limits without providing sufficient information to make an intelligent, informed decision would be contrary to the legislative intent and purpose of § 10-4-609(2). *See Tucker v. County Mutual Insurance Co.,* 125 Ill.App.3d 329, 465 N.E.2d 956 (1984).

Therefore, in reviewing the legislative history and in construing the statute as a whole, we interpret the "offer" in § 10-4-609(2) as requiring that insurers do more than merely make the consumer aware that this coverage is available. Rather, we conclude that this statute imposes a duty upon insurers to offer UM/UIM optional coverage in definite and specific terms so as to allow the consumer to make an intelligent decision regarding whether to accept or reject this coverage.

This interpretation of this statute is in accord with a majority of other jurisdictions with similar statutes. *See Kimbrell v. Great American Insurance Co.,* 420 So.2d 1086 (Fla.1982); *Sobotor v. Prudential Property & Casualty Insurance Co.,* 200 N.J.Super. 333, 491 A.2d 737 (1984); *State Farm Mutual Automobile Insurance Co. v. Wannamaker,* 291 S.C. 518, 354 S.E.2d 555 (1987); *Tucker v. Country Mutual Insurance Co.,* 125 Ill.App.3d 329, 465 N.E.2d 956 (1984); *Johnson v. Concord Mutual Insurance Co.,* 450 Pa. 614, 300 A.2d 61 (1973); *Oatis v. Dairyland Insurance Co.,* 20 Mich.App. 367, 174 N.W.2d 35 (1969); *White v. Safeco Insur-*

ance Co., 68 Or.App. 11, 680 P.2d 700 (1984). *See also* 2 A. Widiss, *Uninsured and Underinsured Motorist Insurance* § 32.5 (1990); Annot., *Construction of Statutory Provision Governing Rejection or Waiver of Uninsured Motorist Coverage*, 55 A.L.R.3d 216 (1974). *But see Silver v. Slusher*, 770 P.2d 878 (Okla.1988); *Lopez v. Midwest Mutual Insurance Co.*, 223 So.2d 550 (Fla.Dist.Ct.App.1969).

■ To determine whether an insurer has made a sufficient "offer" so as to inform the insured adequately regarding this coverage, the Supreme Court of Minnesota, in analyzing a statute similar to ours, held that the insurer's offer must meet the following four-part test:

(1) If the offer is made in other than face to face negotiations, the notification process must be commercially reasonable, whether oral or in writing.

(2) The insurer must specify the limits of its optional coverages and not merely offer them in general terms.

(3) The insurer must intelligibly advise the insured regarding the nature of the optional coverage so as to enable the insured to assess why the offer should be carefully considered.

(4) The insured must be advised that the optional coverages are available for a relatively modest increase in their premium. *Hastings v. United Pacific Insurance Co.*, 318 N.W.2d 849 (Minn.1982). We conclude the standard set forth by the Minnesota Supreme Court in *Hastings* is reasonable and in accord with the legislative intent underlying our statute, and we expressly adopt that standard here.

Therefore, since the record indicates there are disputed facts regarding whether Allstate fulfilled its statutory duty under this interpretation of § 10–4–609(2), summary judgment on this issue was improper.

### B.

■ Plaintiffs also contend that even if Allstate's initial offer to provide higher UM/UIM motorist limits was sufficient, Allstate was required to make a new offer of this coverage when plaintiffs made changes to their policy. Because this issue may arise upon remand of this case, we will address it here. Specifically, we consider whether Allstate was required to send a new offer to plaintiffs regarding their right to obtain higher limits of UM/UIM motorist coverage when they increased their BI liability coverage or when they added a truck to their policy.

The trial court inferentially found that the changes made to plaintiffs' policy merely resulted in a renewal or replacement policy being issued. Accordingly, the trial court held that Allstate was not required to make a new offer of coverages.

To resolve this issue, we must interpret § 10–4–609(3) which provides, in part:

"[A]fter selection of limits by the insured or the exercise of the option not to purchase the coverages described in this section, no insurer ... shall be required to notify any policyholder in any renewal or replacement policy, as to the availability of such coverage or optional limits."

According to this statute, if the increase in bodily injury coverage or the addition of the truck resulted in a renewal or replacement policy, then Allstate was not required to make an additional offer of increased UM/UIM coverage to plaintiffs. If, however, these changes resulted in a new policy being issued, rather than a renewal or replacement policy, then Allstate was required to extend a new offer to plaintiffs. Thus, we must determine whether these changes come within the term "renewal or replacement policy."

Section 10–4–601(3), C.R.S. (1987 Repl. Vol. 4A) defines "renewal" or "to renew" as:

"the issuance and delivery by an insurer of a policy replacing at the end of the policy period a policy previously issued and delivered by the same insurer, or the issuance and delivery of a certificate or notice extending the term of the policy beyond its policy period or term; but ... any policy with no fixed expiration date, shall, for the purpose of this part 6, be considered as if written for successive policy periods or terms of one year...."

Plaintiffs argue that each change to their policy created a new policy and not a mere renewal and that, therefore, upon each change Allstate was required to make a new offer of optional coverage. Although Allstate admits that, as a regular business practice, it informs insureds when they are eligible to obtain higher UM/UIM coverage, Allstate argues that it is not required by law to give such notice. Rather, Allstate contends that any type of change to a policy only supplements the existing policy and the only time a "new" policy is issued is when insureds change insurance carriers.

Our appellate courts have not previously addressed this issue. In reviewing authority from other jurisdictions, we find a diversity of opinion on this subject. Some courts have held that certain changes are material alterations to the existing policy and, therefore, give rise to a new policy, not a mere renewal or replacement policy. *See State Farm Mutual Auto Insurance Co. v. Arms,* 477 A.2d 1060 (Del.Sup.1984) (increase in liability coverage and substitution of one motor vehicle for another are material alterations that give rise to a new policy); *Lucky v. Equity Mutual Insurance Co.,* 259 Ark. 846, 537 S.W.2d 160 (1976) (substitution of vehicle requires new offer of uninsured coverages).

Other jurisdictions, however, have held that changes in an existing policy do not create new contracts of insurance and, therefore, no new offer of optional coverage is required. *See Hicks v. State Farm Mutual Automobile Insurance Co.,* 568 P.2d 629 (Okla.1977) (substitution of one vehicle for another does not give rise to new policy of insurance); *Makela v. State Farm Mutual Automobile Insurance Co.,* 147 Ill.App.3d 38, 100 Ill.Dec. 505, 497 N.E.2d 483 (1986) (addition of vehicle to policy does not give rise to new insurance policy); *cf. El–Habr v. Mountain States Mutual Casualty Co.,* 626 S.W.2d 171 (Tex.App.1981) (endorsement to an existing insurance policy which added new vehicle did not give rise to new policy).

In a slightly different approach, the Tennessee courts have held that the dispositive issue was whether the insured knew of his or her right to purchase the optional coverage at the time changes were made to the policy. *Groover v. Torkell,* 645 S.W.2d 403 (Tenn.App.1982); *see American Fire & Indemnity Co. v. Spaulding,* 442 So.2d 206 (Fla.1983).

In our opinion, it is when the insured becomes eligible to obtain higher UM/UIM coverage that this information is most crucial. Therefore, in accordance with the legislative intent to ensure that consumers are fully informed of their right to obtain higher limits of UM/UIM liability protection, we interpret the term "renewal or replacement policy" in § 10–4–609(3) to mean the automatic continuation of the preceding policy, without material changes. *See State Farm Mutual Auto Insurance Co. v. Arms, supra* ("[It is when insureds make material changes] that information regarding additional uninsured vehicle protection [is] crucial to [the insured's] decision regarding coverage.").

■ A fortiori, such information would also be required when there are material changes in the policy. Thus, we determine that the increase in plaintiffs' BI coverage and the addition of a vehicle each constituted material alterations to the policy, requiring the insurer to extend a new offer of UM/UIM coverage.

### C.

■ We also agree with plaintiffs that Allstate would be liable if its agent failed to offer the higher coverage to plaintiffs.

Here, it is undisputed that Townsend is Allstate's agent and that he was acting within the scope of his employment by advising plaintiffs regarding their insurance needs. Therefore, Allstate may be liable for Townsend's negligence. *See Dyer v. Johnson,* 757 P.2d 178 (Colo.App.1988).

Whether Allstate or its agent breached the duties imposed by § 10–4–609, and thereby caused harm to plaintiffs, is a disputed question of fact. Thus, granting summary judgment on plaintiffs' claims was error. *See Metropolitan Gas Repair Service, Inc. v. Kulik,* 621 P.2d 313 (Colo. 1980).

## II.

■ Finally, we must also address the jurisdictional issue raised by Allstate. Allstate contends that plaintiffs have failed to state a claim upon which relief can be granted pursuant to C.R.C.P. 12(b)(5). Specifically, it argues that § 10–4–609 does not provide for a private cause of action, thereby precluding plaintiffs from bringing this negligence claim. We disagree.

Initially, we note that when deciding whether a complaint sufficiently states a claim upon which relief can be granted, the reviewing court must view the allegations of the complaint in the light most favorable to the plaintiff. *Bell v. Arnold,* 175 Colo. 277, 487 P.2d 545 (1971).

In determining whether a private cause of action is impliedly authorized in a statute which does not expressly create such a remedy, three factors must be considered:

"(1) Whether the plaintiff is within the class of persons for whose benefit the statute was enacted; (2) whether the legislature intended to create, either explicitly or implicitly, a private cause of action; and (3) whether an implied private cause of action would be consistent with the purpose of the legislative scheme."

*Cloverleaf Kennel Club, Inc. v. Colorado Racing Commission,* 620 P.2d 1051 (Colo. 1981); *Minnick v. City & County of Denver,* 784 P.2d 810 (Colo.App.1989).

As previously discussed, the legislative history of § 10–4–609 indicates the statute was designed to ensure that consumers were informed of the availability and desirability of higher UM/UIM coverage. Plaintiffs here were injured by an underinsured motorist and allege that they were not sufficiently informed of their right to obtain the higher coverage which could have compensated them for their injuries. Thus, taking their allegations as true, *see Bell v. Arnold, supra,* plaintiffs fall squarely within the class of persons that the statute was designed to protect. *See Largo Corp. v. Crespin,* 727 P.2d 1098 (Colo.1986).

Allstate, however, argues that it would be contrary to the intent and purpose of the legislative scheme to imply a private remedy. Relying on the reasoning in *Farmers Group Inc. v. Trimble,* 658 P.2d 1370 (Colo.App.1982), *aff'd on other grounds,* 691 P.2d 1138 (Colo.1984), and *Board of County Commissioners v. Moreland,* 764 P.2d 812 (Colo.1988), Allstate argues that since the Commissioner of Insurance has the power to supervise and discipline insurers under § 10–4–418, these specific remedies exclude all others. This reliance is misplaced.

The court in *Farmers Group Inc. v. Trimble* held that the statutory part which prohibits unfair insurance practices could not provide the sale basis for a private cause of action for an aggrieved insured because the same statutory part already defines numerous sanctions in the event the duties imposed by it are not performed. The *Trimble* court, however, did not preclude other common law remedies against insurers, and this interpretation was codified in 1987, when the General Assembly amended this statutory section to provide that nothing in the statute shall be construed to abrogate any common law contract or tort cause of action. *See* § 10–3–1114, C.R.S. (1987 Repl.Vol. 4A); *Farmers Group, Inc. v. Williams,* 805 P.2d 419 (Colo.1991).

In *Board of County Commissioners v. Moreland, supra,* our supreme court held that it would not imply a private remedy for a breach of a statutory obligation imposed on a governmental entity when there was no indication that the statute contemplated such a remedy. There, a negligence action was brought against the county based upon its failure to enforce a county building code. The *Moreland* court pointed to the fact that the same statutory part which allowed the county to adopt a uniform building code also provided specific remedies in the event the code was breached. The court thus held that to imply a private cause of action would be contrary to the legislative intent because the fact that some remedies were provided reflects that the General Assembly "gave thought to the issue of civil liability but made no provisions for imposition of such liability against the County."

However, in contrast to the situations in both *Trimble* and *Moreland,* the statutory section at issue here, § 10–4–601, et. seq., C.R.S. (1987 Repl.Vol. 4A) (Part 6), does not provide *any* remedies in the event the duties imposed by Part 6 are breached. Although Allstate is correct that the Commissioner is given broad powers to regulate insurance companies under § 10–4–401, et seq., C.R.S. (1987 Repl.Vol. 4A) (Part 4) which governs rate regulations of insurance companies, the sanctions set forth in Part 4 are to remedy general practices by an insurer which do not meet statutory standards, *e.g.,* forms. They do not encompass nor preclude other remedies for specific, single breaches of obligations imposed by Part 6. *Cf. Farmers Group, Inc. v. Williams, supra* (No–Fault Act, which provides insureds statutory remedies if insurer acts in bad faith, does not abrogate existing common law remedies against insurers.).

Finally, implying a private cause of action here is consistent with the legislative intent and purpose underlying § 10–4–609 to provide UM/UIM coverage in every motor vehicle liability policy unless expressly rejected by the insured in writing. To require this coverage to be included in every policy unless expressly rejected by the insured, but then to foreclose the insured's right to relief for failure to provide this coverage, would, in all practicality, circumvent this statutorily imposed duty.

Therefore, we conclude that plaintiff may assert a private cause of action based upon violations of § 10–4–609, C.R.S. (1987 Repl.Vol. 4A).

The judgment is reversed, and the cause is remanded for further proceedings consistent with this opinion.

CRISWELL and MARQUEZ, JJ., concur.