**Guiseppe SCIAROTTA, Plaintiff,**

**v.**

**Hon. Otis R. BOWEN, etc., Defendant.**

**Civ. No. 85–2507 (AET).**

United States District Court,
D. New Jersey.

Aug. 9, 1989.

Pellettieri, Rabstein & Altman, Trenton, N.J., for plaintiff.

Stephanie Ebers, Asst. U.S. Atty., Newark, N.J., and Peter O'Malley (on appeal), for defendant.

## OPINION

ANNE E. THOMPSON, District Judge.

This matter comes before the court on remand from the United States Court of Appeals for the Third Circuit. *Sciarotta v. Bowen*, 837 F.2d 135 (3d Cir.1988). Pursuant to the opinion of the Third Circuit, the sole issue before the court is to determine "... whether the Social Security Administration's ["SSA"] method of converting plaintiff's lump sum workers' compensation settlement to a stream of periodic payments, based on the assumption that the settlement represented the maximum allowable monthly payment, was rational." *Id.* at 136.

*Factual and Procedural Background*

Mr. Sciarotta, a 49–year old machine operator, suffered a permanently disabling heart attack at work on July 19, 1979. At that time his gross weekly wages were $270.40, as stated in his petition for New Jersey workers' compensation. The SSA awarded him social security disability insurance benefits as of the date of his disability heart attack, pursuant to 42 U.S.C. § 423. Sciarotta also filed a claim for New Jersey state workers' compensation benefits under N.J.S.A. §§ 34:15–1 *et seq.*, which he settled on October 15, 1981, for a lump sum of $40,000. $5,000 of this award was deducted for attorney's fees, leaving Sciarotta a net lump sum award of $35,000. This settlement, by its terms, had "the effect of a dismissal with prejudice" of his claim, and constituted a "complete and absolute surrender and release of all [his] rights arising out of this/these [workers' compensation] claim(s)." New Jersey had applied a reduction to the amount it was willing to pay when the parties settled on the $40,000 figure because Sciarotta was receiving federal social security disability benefits.

After being advised of this settlement, the SSA determined that Sciarotta's social security disability benefits were subject to offset because Sciarotta's benefits remained above 80% of his pre-disability salary, despite the reduction in benefits implemented by New Jersey. Prior to reduction by SSA, Sciarotta had received $627.20 per month in social security disability benefits. After the offset against the workers' compensation lump sum settlement had been calculated, claimant's social security disability income was reduced to $396 per month, a reduction of $231.20.

To accomplish the offset, SSA converted Sciarotta's lump sum settlement into a theoretical stream of periodic workers' compensation benefits. In converting the lump sum to determine the offset, the SSA followed instructions issued by the Secretary of Health and Human Services ("Secretary") in the SSA's Program Operation Manual System ("POMS"), at § D1 11501.-235C (July, 1986). The instructions set forth a three-step procedure for prorating a state lump sum award "at an established weekly rate." The three steps are to be applied in priority order as follows (quoting from POMS, *supra*):

1. The rate specified in the lump-sum award. If the award specifies a rate based on life expectancy list the case under code 557.

2. The periodic rate paid prior to the lump-sum (if no rate is specified in the lump-sum award).

3. If WC [Workers' Compensation], the State's WC maximum in effect in the year of injury. This figure can be used if no rate is specified in the award or there was no preceding periodic benefit. It can also be used pending post-adjucative development of the rates specified in 1 or 2.

The SSA correctly determined that steps 1 and 2 do not apply to Mr. Sciarotta's situation, and used step 3 to determine the offset amount. Accordingly, the SSA divided claimant's net lump sum workers' compensation award of $35,000 by the maximum weekly benefit allowable under New Jersey law in 1979, $156 per week. Had Sciarotta successfully litigated his claim, he would have received $156 per week for at least 450 weeks, or $70,200. N.J.S.A.

34:15–12(a) and (b) (West, 1979). The $156 represents 75% of the statewide average weekly wages in New Jersey in 1979, as computed, determined, and promulgated by the New Jersey Commissioner of Labor and Industry, in accordance with statute. *Id.*

Dividing $35,000 by $156, the SSA determined that Sciarotta's compensation settlement theoretically represented a stream of New Jersey workers' compensation payments of $156 per week for 224 weeks, or approximately 4.3 years. Combining this theoretical amount with claimant's social security disability insurance benefits, the SSA determined that his total government benefits impermissibly exceeded 80% of his pre-disability earnings, and therefore reduced his federal disability payments by $231.20 per month, the "overpayment," for 224 weeks.

Sciarotta appealed the reduction of social security payments decision administratively. The Appeals Council, the final level of administrative review, denied claimant's request for review on March 27, 1985, thus rendering the decision of the Secretary final. Claimant then sought judicial review of this decision in the United States District Court for the District of New Jersey. On November 14, 1986, Judge Cowen, applying the literal words of the statutory provision authorizing such reductions, 42 U.S.C. § 424a, held that where a state imposes a reduction on workers' compensation payments because of the receipt of federal disability benefits, as here, the SSA may not in turn reduce the federal disability benefits because of the receipt of the state workers' compensation benefits. *Sciarotta v. Secretary of Health and Human Services,* 647 F.Supp. 132 (D.N.J.1986).

The Secretary appealed the district court decision to the United States Court of Appeals for the Third Circuit. On January 19, 1988, the Circuit Court reversed the district court's order, and upheld the SSA's right to reduce disability benefits to offset state workers' compensation benefits in those cases where the state offset does not reduce total government benefits to less than 80% of pre-disability earnings. *Sciarotta v. Bowen,* 837 F.2d 135 (3d Cir.1988). The Third Circuit also considered and remanded to this court an issue raised earlier by the claimant but not reached in the district court's consideration of this matter: whether the SSA's proration method was rational and appropriate.

*Discussion*

The only issue this court is to consider on remand is whether Step 3 of the Secretary's proration method is "rational." The Social Security Act states that when benefits other than Social Security disability are payable on other than a monthly basis, as in the instant case, the proration offset implemented by SSA "shall be made at such time or times and in such amounts as the Secretary finds will approximate as nearly as practicable the reduction" outlined in detail for benefits payable on a monthly basis. 42 U.S.C. § 424a(b).

The proration device is not contained in regulations promulgated by the Secretary, but is stated in an internal departmental operating manual. As such, the provision in question is an "interpretive rule" designed by an agency to give guidance to its staff and affected parties as to how the agency intends to administer a statute or regulations. *State of New Jersey v. Dept. of Health and Human Services,* 670 F.2d 1262, 1281–82 (3d Cir.1981). The provision cannot be said to be a formal legislative rule because it was not formulated through the standard rule-making procedures, such as the holding of hearings, publication in the *Federal Register,* and formal adoption in the *Code of Federal Regulations.* The court notes that although the APA sets forth formal rule-making procedures, these provisions do not apply to the promulgation of interpretive rules. *State of New Jersey, supra* at 1281.

The standard of review that should be applied by a court in evaluating an interpretative rule is a settled question in the Third Circuit. Such rules are "not controlling upon the courts." *See United States v. Pennsylvania Industrial Chemical Corp.,* 411 U.S. 655, 674, 93 S.Ct. 1804, 1816, 36 L.Ed.2d 567 (1973) (*quoting Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65

S.Ct. 161, 164, 89 L.Ed. 124 (1944); *see also, St. James Hospital v. Harris,* 535 F.Supp. 751, 763 (N.D.Ill.1981), *rev'd on other grounds,* 698 F.2d 1337 (7th Cir. 1983), *cert. denied,* 464 U.S. 830, 104 S.Ct. 107, 78 L.Ed.2d 110 (1983) (courts will accord less deference to an interpretative rule than to a legislative one). Courts remain free to substitute their judgment for that of the agency in determining how the statute or regulation is to be implemented. *State of New Jersey, supra* at 1282. As an interpretative rule is simply the agency's opinion of the meaning of a statute, it does not bind a reviewing court, which must examine the interpretation just as it would approach any other question of law; however, to the extent "the Administrator's interpretation represents a reasonable accommodation of manifestly competing interests," it is "entitled to deference." *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

Interpretative regulations, such as step 3 of the proration instructions at issue here, are merely advisory, and, if regulations are interpretative, a reviewing court may use its own judgment as to what the authorizing statute requires, when the validity of an agency action is questioned. *National Association of Pharmaceutical Mfrs. v. Department of Health and Human Services,* 586 F.Supp. 740, 743 n. 1 (S.D.N.Y. 1984). The only question with which this court is concerned is whether the Interpretive Rule is rational. *See Sciarotta, supra,* 837 F.2d 135. The practical application of this rule, as seen in Mr. Sciarotta's case, results in the settlement lump sum payment's being divided by the maximum allowable weekly payment under SSA; from that calculation the SSA determined that Mr. Sciarotta's lump sum payment of $35,000 was the equivalent of receiving $156 per week for 224 weeks, or 4.3 years. Adding the $156 to Mr. Sciarotta's social security benefits, the SSA determined that his total benefits exceeded 80% of his predisability earnings by approximately $231 per month; SSA then reduced Mr. Sciarotta's federal benefits by $231 per month for 4.3 years. Therefore, this court must consider whether dividing the lump sum payment by the maximum weekly benefit, as provided in Step 3 of the Interpretive Rule, is a rational means by which SSA calculates the amount by which it reduces the claimant's federal benefits.

In evaluating this question the court must be guided by the statutory language, the relevant legislative history, the opinion of the Third Circuit in this case, and other relevant case law.

■ The primary objective of the disability provisions of the social security system is to provide workers and their families with basic protection against hardships created by loss of earnings due to illness or old age. *Mathews v. DeCastro,* 429 U.S. 181, 185–86, 97 S.Ct. 431, 434–35, 50 L.Ed.2d 389 (1976). The disability insurance program, like the other insurance aspects of the Social Security Act, is contributory in nature, and is designed to prevent public dependency by protecting workers and their families against common economic hazards, wholly without regard to the need of the recipient. *Id.* at 186, 97 S.Ct. at 434–35, interpreting H.R.Rep. No. 615, 74th Cong., 1st Sess., 1 (1935).

In 1950, the basic Social Security Act of 1935 was amended to provide, for the first time, federal grants-in-aid to the states so that assistance could be furnished "to needy individuals eighteen years of age or older who are permanently and totally disabled." Social Security Act Amendments of 1950 § 351, 64 Stat. 555. In 1956, Congress created a program for disability insurance benefits. Social Security Amendments of 1956, § 103(a), 70 Stat. 815. Again, the insurance program, unlike the public assistance provisions, was designed to protect against the specific economic hardships created by involuntary, premature retirement. *Mathews, supra* at 186, 97 S.Ct. at 434–35, interpreting H.R.Rep. No. 1300, 81st Cong., 1st Sess., 27–28, 53–54 (1949); Recommendations for Social Security Legislation, Reports of the Advisory Council on Social Security, Senate Doc. No. 208, 80th Cong., 2d Sess., 69–70, 95–97 (1949); S.Rep. No. 2133, 84th Cong., 2d

Sess., 3–4 (1956). H.R.Rep. No. 1189, 84th Cong., 1st Sess., 3–6 (1955).

Thus, the underlying purpose of the basic social security disability insurance program is to prevent public dependency by protecting disabled workers and their families against economic hazards and hardships by paying sufficient insurance benefits to those who are qualified, so that disabled persons and their families will not be forced into eventual poverty and onto public assistance. The disability insurance program is a contributory insurance program clearly designed to prevent need, even though it is not need-based.

There is tension between this underlying intent and purpose of the basic disability insurance act and the subsequent amendments that allow for offsets and reductions; but, the basic act as codified at 42 U.S.C. § 423, must be read *in pari materia* with the later amendments. *Guarino v. Celebrezze,* 222 F.Supp. 345, 348 (E.D. Pa.1963), *aff'd* 336 F.2d 336 (3d Cir.1964). Statutes dealing with the same subject matter, as §§ 423 and 424a do, are to be read together and harmonized when possible. *Matter of Johnson,* 787 F.2d 1179, 1181 (7th Cir.1986).

The legislative history of the federal offset provisions indicates that Congress enacted 42 U.S.C. § 424a because it was concerned that the concurrent receipt by disabled workers of both federal disability and state workers' compensation benefits would lead to overpayments and/or duplication of benefits to the extent that a disabled worker might collect benefits that would exceed her or his former salary. S.Rep. No. 404, 89th Cong., 1st Sess., *reprinted in* 1965 U.S.Code & Admin.News 1943, 2040–2042. At the same time, Congress intended to minimize inequities for the disabled worker and to prevent erosion in the earnings replacement value of disability benefits. *Id.* at 2040.

The legislative histories reviewed by the court reveal that Congress intended to balance society's and the disabled workers' interests in being protected against financial harm resulting from disability with society's interest in preventing a disabled worker from collecting excessive combined benefits. Thus, Congress provided that the total government-funded benefits that a disabled worker may collect if she or he is collecting federal social security disability insurance benefits may not exceed 80% of the claimant's "average current earnings" at the time of disability. *Id.* at 2041; 42 U.S.C. § 424a. Congress also clearly delegated to the Secretary authority to implement its expressed legislative purposes in the form of regulations and interpretive rules. While step 3 of the proration calculation method, described above, fulfills the purposes of reduction of benefits provisions expressed in the 1965 amendment to the Act, codified at 42 U.S.C. 424a, and subsequent modifying amendments, the method is not necessarily consistent with the underlying purposes of the Social Security Disability Insurance Act itself, 42 U.S.C. § 423.

An examination of the relevant case law reveals no cases directly on point; however, certain decisions may inform the court's analysis. In *Altobella v. Bowen,* 668 F.Supp. 1134 (N.D.Ill.1987), the District Court held that the Secretary properly prorated the claimant's worker's compensation lump sum payment on the basis of the weekly sum to which he would have been entitled for the 45% loss which the lump sum payment represented, rather than prorating the lump sum over the claimant's period of life expectancy or over the course of the claimant's disability. *Id.*

*Altobella* is distinct from *Sciarotta.* First, the claimant in *Altobella* was only partially, though permanently, disabled. As noted in the Secretary's brief, in enacting the offset provisions, Congress was concerned that if workers received benefits in excess of their pre-disability pay, they would have a reduced incentive to return to work, thus impeding the rehabilitative efforts of the state programs. *Richardson v. Belcher,* 404 U.S. 78, 83–84, 92 S.Ct. 254, 258–59, 30 L.Ed.2d 231 (1971). (Defendant's Brief, p. 21). That principle would clearly apply to someone like Mr. Altobella, a partially disabled worker perhaps subject to rehabilitation and a consequent return to

work. It would not, however, apply to someone in the position of Mr. Sciarotta for whom rehabilitation and return to work seem not to be relevant concerns. Second, in Mr. Altobella's case, a representative from his employer's worker's compensation insurance carrier informed the Secretary that the lump sum represented a settlement at $140 per week for 225 weeks; three years later, the representative re-affirmed these facts. *Id.* at 1136. No such information has been provided in Mr. Sciarotta's case. Finally, the court notes that it is not bound by the holding of an Illinois district court. It appears as if no other federal court has grappled with the issue squarely before us today.[1]

The court next will examine the arguments of the parties. Mr. Sciarotta asserts that because the lump sum payment is the only worker's compensation benefit he will receive for the remainder of his life, it is irrational to prorate the award over only 4.3 years. He further contends that it is irrational for SSA to assume that his award represents the maximum allowable benefit when, in reality, it represents a compromised claim in which each entity opted to reduce its demands to avoid the risks attendant with going to trial. Sciarotta argues instead that the lump sum award should be prorated over his remaining life expectancy, which at the time of the award of Social Security disability was 23.91 years. Calculating the lump sum along these lines, Sciarotta states that he is receiving only $28 per week, rather than the $156 per week that SSA had calculated. Using the figure of $28 per week, Sciarotta contends that his total benefits do not exceed 80% of his pre-disability earnings and that, as a result, no federal offset should be imposed.

The Secretary contends that the proration rule applied to Mr. Sciarotta's case is rational and must be upheld unless it is "arbitrary" or "capricious." *Wheeler v. Heckler*, 787 F.2d 101, 104 (3d Cir.1986).

The Secretary raises a number of points to support his argument that the rule is rational. First, the Secretary asserts that application of the maximum weekly rate is appropriate because Mr. Sciarotta would have received this amount had he elected to receive periodic benefits rather than a lump sum payment. However, as noted by the Third Circuit, the Secretary does not explain how he concluded that Sciarotta's settlement represented the maximum allowable under New Jersey law. *Sciarotta, supra*, 837 F.2d at 141. Further, as Mr. Sciarotta notes, because he settled the case, he opted not to receive the full benefit to which he might otherwise have been entitled, and therefore it is inappropriate to treat the worker's compensation award as being the "maximum allowable."

The Secretary further argues that this method of proration is the most efficient and accurate method, it quickly eliminates the period during which the offset must occur, and other courts have upheld this method (*citing Altobella, supra*). However, none of these arguments support the rationality of the rule. First, an equally efficient and accurate method of calculating the offset is, in cases of permanent and complete disability, to allocate the benefits over the claimant's remaining life expectancy. Second, it is irrelevant that the offset period is eliminated quickly. Third, as indicated above, no other court has ruled on the specific issue presently before the court.

The Secretary raises three additional arguments. First, he asserts that it is Congress' function to change the rule if it is unfair. This, however, is inaccurate, as Mr. Sciarotta is challenging an interpretive rule, not the statute itself. Also, it is this court's duty to strike down a rule it finds to be arbitrary and capricious. Second, the Secretary argues, alternative methods, such as those proposed by the Third Circuit, are unworkable and would be an administrative burden. As noted above, this

---

**1.** In *Mann v. Heckler*, 1A Unempl.Ins.Rep. (CCH) ¶ 16,952 (D.Me. Mar. 17, 1986), *aff'd* 802 F.2d 440 (1st Cir.1986), *reprinted in* Social Security Ruling 87–21C, which the Secretary cites in support of his proration method, the SSA's application of step 2 of the POMS proration method is upheld. (Defendant's Brief, p. 15). However, it is solely the rationality of step 3, and not step 2, of that method which is being challenged by Mr. Sciarotta.

is not necessarily so; further, merely because a policy is straightforward in its application does not make it rational. Finally, the Secretary contends that the *duration* of a potential worker's compensation award is unknown if a worker chooses to settle; therefore, it is reasonable to use the periodic *rate* (*i.e.*, maximum weekly benefit) to which the worker would be entitled to calculate the offset. This statement, however, does nothing but prove itself; as this court previously noted, there is an absence of logic in applying the maximum weekly benefit rate when all sides acknowledge that a settlement implicitly means that neither side is obtaining the "maximum" it sought originally. Furthermore, when a claimant is completely and permanently disabled, the Secretary's argument becomes irrelevant because the duration of a potential worker's compensation award is the life expectancy of the claimant, or the 450–week initial maximum on disability awards. The court finds it hard to accept the Secretary's contention that it is problematic to make such determinations, as Step 1 of the Interpretive Rule in question considers questions of life expectancy; further, even if such calculations are difficult, the Secretary could use the maximum payment period, which currently is 450 weeks and is set by state statute. *See* N.J.S.A. 34:15–12(b). Finally, the court notes that in making each of these arguments, the Secretary merely has set forth his conclusory allegations; he has supplied no evidence to support his assertions.

■ The court now turns to the guidance provided by the Third Circuit. The Third Circuit noted that it found Mr. Sciarotta's arguments to be "extremely forceful." *Sciarotta, supra,* 837 F.2d at 141. Although the Circuit found it was "more appropriate for the district court" to consider whether the SSA's calculation is irrational, it noted "that if Sciarotta's allegations ... prove true, and if the Secretary provides no further explanation, we can see no rational basis for the proration method used by the SSA." *Id.* The court finds that the Secretary has failed to provide sufficient "further explanation" than the "effort [he

made] to defend or explain the SSA's calculations," *id.*, to the Third Circuit.

In addition to the reasons already set forth by the court indicating the inadequacy of the Secretary's presentation, the court also notes that applying the current proration methodology to state workers' compensation lump sum settlements operates as a virtual penalty on those disabled workers who wish to avoid the expense and stress of litigation by deciding to settle their state workers' compensation claims. The proration method used in step 3 effectively penalizes disabled workers for accepting lump sum settlements of their state worker's compensation claims by assuming that such settlements represent the maximum allowable benefit for the shortest period of time, and thus guaranteeing, in most cases, the application of the federal offset and subsequent reduction of federal benefits. This proration method does not fulfill the intent of Congress in enacting the original basic disability insurance program, which is to provide adequate federal disability insurance benefits. In maximizing the facilitation of the 80% limit on government benefits envisioned by Congress in enacting § 424a, the Secretary may have lost sight of the underlying intent of § 423.

The Third Circuit has ruled that prorating is an acceptable practice; the holding of this court accepts that principle, yet for the reasons set forth above, this court finds the Secretary's method of implementation of step 3 as applied to Mr. Sciarotta is arbitrary. This court finds that it is irrational for the SSA to prorate Mr. Sciarotta's lifetime worker's compensation settlement in such a way as to minimize the time period over which SSA deems it to apply and further finds that the application of step 3 of the proration rule to Mr. Sciarotta is inconsistent with the express purpose of the Social Security Act.

### ORDER

This court having considered this matter on remand from the Third Circuit, and for good cause having been shown;

It is on this 8th day of August 1989,

ORDERED that, consistent with the Third Circuit opinion in this matter, the application of Step 3 of Interpretive Rule § D1 11501.235 C to plaintiff's case be and hereby is found to be irrational and inconsistent with the express purpose of the Social Security Act and therefore cannot be used to prorate his lump sum worker's compensation.