Gale F. BARNETT and Gary
Barnett, Petitioners,

v.

AMERICAN FAMILY MUTUAL
INSURANCE COMPANY,
Respondent.

No. 91SC464.

Supreme Court of Colorado,
En Banc.

Jan. 11, 1993.

As Modified on Denial of Rehearing
Feb. 1, 1993.

Frederick W. Newall, Colorado Springs, for petitioners.

Kane, Donley & Shaffer, Thomas Kelly Kane, William A. Palmer, Colorado Springs, for respondent.

Wilcox, Ogden & Cox, P.C., Ralph Ogden, Denver, for amicus curiae Colorado Trial Lawyers Ass'n.

Justice VOLLACK delivered the Opinion of the Court.

Petitioners Gale F. and Gary Barnett (the Barnetts) petition from the court of appeals decision in *American Family Insurance Co. v. Barnett*, 821 P.2d 853 (Colo.App. 1991). The court of appeals found that a limit of payable benefits clause in the Barnetts' automobile insurance policy was valid, and was properly applied to set off Social Security Disability Insurance (SSDI) benefits received for injuries which Gale Barnett (Barnett) sustained in an accident. We reverse and remand with directions.

I.

Gale and Gary Barnett were insured under a contract of liability insurance, policy No. 05–001426–01, with American Family Mutual Insurance Company (American Family). The policy took effect on December 22, 1983. The Barnetts' policy with American Family contained uninsured-underinsured motorist (UM/UIM) coverage for bodily injury of $100,000 for each person and $300,000 for each accident. The damage recovery provision of the Barnetts' policy provided in pertinent part:

> We will pay damages for bodily injury which an insured person is legally entitled to recover from the owner or operator of an uninsured motor vehicle or an underinsured motor vehicle. The bodily injury must be caused by accident and arise out of the use of the uninsured motor vehicle or the underinsured motor vehicle.

(Emphasis omitted.) The policy also contained a section entitled "Limits of Liability," which provided:

> Any amounts payable will be reduced by:

> 1. A payment made by the owner or operator of the uninsured motor vehicle or organization which may be legally liable.

> 2. A payment under the Liability coverage of this policy.

> 3. *A payment made or amount payable because of bodily injury under any workers' compensation or disability benefits law or any similar law.*

(Emphasis omitted and added.)

On March 17, 1984, the Barnetts were involved in an automobile accident with Robert Scott Minson (Minson), an underinsured motorist, who was driving a car owned by Lulubelle Morton (Morton). Barnett, who was a passenger in the car driven by her husband, was seriously injured as a result of the accident. Barnett stopped working on April 2, 1985.

On March 11, 1987, Barnett filed an application for Social Security Disability Insurance (SSDI) benefits based upon a disability due to neck, back, and hip injuries which were allegedly caused by the car accident.

On August 20, 1987, the Barnetts initiated a personal injury action against Minson for the injuries Barnett received in the accident and for a loss of consortium for Gary Barnett. Like the Barnetts, Morton and Minson were insured under an American Family policy. The liability insurance policy was in Morton's name for the amount of $50,000.

On September 22, 1988, a Federal Administrative Law Judge found Barnett disabled, and awarded her SSDI benefits to be retroactively applied to April 2, 1985, the date she stopped working. Barnett was awarded SSDI benefits of approximately $430 a month for herself and an additional $170 a month for her children under sections 416(i) and 423 of the Federal Social Security Act, 42 U.S.C. §§ 401–433 (1988).

The Barnetts settled the personal injury action against Morton and Minson for $50,-000, the liability limit under Morton's casu-

alty policy. American Family contends, and the Barnetts do not dispute, that the Barnetts' settlement with Minson is set off from the underinsured motorist benefits limits of $100,000, leaving a total additional coverage of $50,000 available to the Barnetts. The Barnetts placed American Family on notice that they would initiate a claim through the arbitration process for underinsured motorist benefits under policy No. 05–001426–01.

American Family initiated a declaratory judgment action, requesting a court determination of whether the SSDI benefits may be set off from the underinsured motorist benefits available to Barnett. American Family filed a motion for summary judgment in which it argued that the award from the Social Security Administration should be set off from any award made by the arbitration panel in the underinsured motorist claim pursuant to the Colorado collateral source limitation statute, § 13–21–111.6, 6A C.R.S. (1987) ("collateral source statute"), and subsection (3) of the "Limits of Liability" section of the American Family contract, which provides for the set-off of benefits payable under "any … disability benefits law or any similar law" ("the subsection (3) set-off clause").

The Barnetts answered and filed a motion for summary judgment, arguing that the subsection (3) set-off clause in the insurance policy is void because it contravenes public policy. The Barnetts also argued that applying the collateral source statute to this accident would unconstitutionally violate the contracts clause and their rights to due process and equal protection.

In a written order dated February 6, 1990, the trial court allowed the set-off. The trial court held that the subsection (3) set-off clause in the insurance policy was valid, and that the collateral source statute, as applied to the facts of this case, does not violate either the United States or Colorado constitutions. Accordingly, the trial court granted American Family's motion in full and stated that American Family may submit the SSDI benefits received by Barnett to the arbitration panel for set-off under either the insurance policy or the collateral source statute.

The court of appeals affirmed the trial court's finding that the set-off of the SSDI benefits was valid. The court of appeals found that the set-off was proper under the subsection (3) set-off clause in the insurance policy, and, consequently, it did not address the question of whether the collateral source limitation statute is unconstitutional.

We granted certiorari to review the holding of the court of appeals that the uninsured motorist statute, § 10–4–609, 4A C.R.S. (1987), allows an insurance company to reduce the $100,000 in uninsured/underinsured motorist coverage which was purchased by the Barnetts, and which American Family was required by section 10–4–609(2), 4A C.R.S. (1987), to offer, by the amount of SSDI benefits received by the insured as a result of the injuries for which she claims uninsured/underinsured motorist benefits. *Barnett*, 821 P.2d 853. We reverse the judgment of the court of appeals and remand the case for further proceedings.

## II.

■ American Family argues that Barnett's SSDI benefits should be set off from the UM/UIM benefits available to Barnett under the policy in accordance with the subsection (3) set-off clause in the contract. The Barnetts contend that the subsection (3) set-off clause in the American Family policy contravenes public policy because it undermines the purpose of the UM/UIM statute to prevent inadequate compensation to tort victims such as the Barnetts, and because it would minimize rather than maximize UM/UIM coverage.

Relying upon *Perkins v. Riverside Insurance Co. of America*, 141 Mich.App. 379, 367 N.W.2d 336 (1985), the court of appeals held that American Family could reduce the Barnetts' UM/UIM motorist

coverage by the amount of SSDI benefits Barnett received for injuries caused by the same accident. *American Family Ins. Co. v. Barnett,* 821 P.2d 853 (Colo.App.1991).

We disagree with the holding of the court of appeals. We first find that *Perkins* should not have been applied. Further, we find that the subsection (3) set-off clause, with respect to the set-off of SSDI benefits, is void in contravention of public policy in this case. The subsection (3) set-off clause violates the General Assembly's intention that UM/UIM coverage "provide an insured with benefits to the extent necessary to recover for loss caused by a negligent and financially irresponsible motorist, subject to policy limits." *Kral v. American Hardware Mut. Ins. Co.,* 784 P.2d 759, 765 (Colo.1989).

### A.

In finding that the subsection (3) set-off clause was valid, the court of appeals relied on *Perkins,* which was predicated upon both a Michigan statute and Michigan case law requiring personal protection insurance benefits to be set off by state and federal governmental benefits. *Perkins,* 367 N.W.2d 336; *see* Mich. Comp. Laws § 500.-3109(1) (1982); *see also Wolford v. Travelers Ins. Co.,* 92 Mich.App. 600, 285 N.W.2d 383 (1979). *Perkins* is not the appropriate standard to apply in this case because Colorado does not statutorily require governmental benefits to be set off against UM/UIM benefits.

Unlike the Michigan statute, the Colorado Auto Accident Reparations Act, §§ 10–4-701 to –723, 4A C.R.S. (1987) (the No Fault Act), does not require insurance benefits to be set off by either federal or state governmental benefits as a general rule. Colorado does, however, require that benefits recovered under the Workers' Compensation Act of Colorado be set off against No Fault benefits. § 10–4–707(5), 4A C.R.S. (1987). This section provides:

> When a person injured is a person for whom benefits are required to be paid under the "Work[ers'] Compensation Act of Colorado", the coverages described in section 10–4–706(1)(b) to (1)(e) shall be reduced to the extent that benefits are actually available and covered under said act within the time period for payment of benefits under this part 7 prescribed by section 10–4–708.

Given that the Colorado statute does not expressly address whether SSDI benefits, like Workers' Compensation benefits, should be set off from UM/UIM benefits, the *Perkins* test is not the proper standard to apply.

### B.

The Colorado legislature has expressed a strong public policy in favor of protecting individuals from financial losses caused by uninsured or underinsured motorists. The legislature made the following declaration of purpose in enacting Colorado's first uninsured motorist statute in 1965:

> The general assembly is acutely aware of the toll in human suffering and loss of life, limb, and property caused by negligence in the operation of motor vehicles in our state. Although it recognizes that this basic problem can and is being dealt with by direct measures designed to protect our people from the ravages of irresponsible drivers, the general assembly is also very much concerned with the financial loss visited upon innocent traffic accident victims by negligent motorists who are financially irresponsible. In prescribing the sanctions and requirements of this article, *it is the policy of this state to induce and encourage all motorists to provide for their financial responsibility for the protection of others, and to assure the widespread availability to the insuring public of insurance protection against financial loss caused by negligent financially irresponsible motorists.*

Ch. 91, sec. 1, § 13–7–60, 1965 Colo.Sess. Laws 333 (emphasis added); § 42–7–102, 17 C.R.S. (1984). In applying the uninsured

motorist statute, § 10–4–609, 4A C.R.S. (1987),[1] Colorado courts have sought to provide full and adequate compensation for tort victims who are injured by uninsured and underinsured motorists. *Kral v. American Hardware Mut. Ins. Co.*, 784 P.2d 759 (Colo.1989); *Newton v. Nationwide Mut. Fire Ins. Co.*, 197 Colo. 462, 594 P.2d 1042 (1979); *Nationwide Mut. Ins. Co. v. Hillyer*, 32 Colo.App. 163, 509 P.2d 810 (1973).

In *Newton v. Nationwide Mutual Fire Insurance Co.*, 197 Colo. 462, 594 P.2d 1042 (1979), we found that a policy provision that allowed an insurer to reduce amounts payable under UM coverage by any benefits payable under personal injury protection (PIP) coverage was contrary to public policy and void. *Id.* Julia Newton, the insured party, had an auto insurance policy with Nationwide which contained the compulsory personal injury protection coverage required by the No Fault Act. In addition, Newton's policy contained UM coverage in the amount of $15,000 per person and $30,000 per accident, which was the statutorily required minimum amount of UM insurance insurers were required to offer insureds at the time. § 10–4–319, 4 C.R.S. (1973); § 42–7–103, 17 C.R.S. (1973).[2] The Nationwide policy included the following set-off clause:

> "Any amount payable under the Family Protection Coverage (Uninsured Motorist) shall be reduced by the amount of any personal injury protection benefits paid or payable or which would be paid or payable but for the application of a deductible under this or any other automobile insurance policy because of bodily injury sustained by an eligible injured person[.]"

*Newton*, 197 Colo. at 464, 594 P.2d at 1043. When Newton, and two passengers in her car, were involved in an accident with an uninsured motorist, Nationwide paid a total of $5,865.05 under the policy's PIP coverage, and the arbitration panel determined that the claimants were entitled to recover $15,250.00 under the UM coverage. Nationwide sought to set off the PIP award from the UM award.

We found in *Newton* that PIP benefits are separate and distinct from UM benefits. *Id.* 594 P.2d at 1043. The two types of coverage are provided for in separate contractual provisions, and separate premiums are collected. PIP coverage is mandatory while UM coverage is not.[3] The *Newton* court found:

> Comparing the benefits payable under PIP with those payable under uninsured motorist coverage demonstrates that the respective coverages overlap to some extent but are not duplicative. The minimum benefits required to be covered by PIP include medical expenses, rehabilitation and occupational training costs, lost wages, and, to some extent, loss of essential services that the injured person would have performed without being paid. In contrast, uninsured motorist coverage compensates for *any loss* arising from bodily injury or death up to the policy limits. Thus, absent a set-off, under uninsured motorist coverage one can recover losses incurred above the PIP limits for medical expenses, lost wages and lost essential services, plus general damages different in kind from those compensable under the PIP provisions, such as pain and suffering.

*Id.*, 594 P.2d at 1043–44 (citation and footnotes omitted).

---

1. The original uninsured motorist statute was amended in 1983 to require coverage for underinsured motorists as well as uninsured motorists. Act approved May 4, 1983, ch. 92, sec. 1, 1983 Colo.Sess. Laws 454; § 10–4–609(4), 4A C.R.S. (1987).

2. Insurers are currently required to offer, under § 10–4–609(2), 4A C.R.S. (1987), minimum UM/UIM coverage in the amount of $25,000 per

person and $50,000 per accident. § 42–7–103(2), 17 C.R.S. (1984).

3. An insurer is required to offer UM coverage, but the insured may reject such coverage in writing. § 10–4–319, 4 C.R.S. (1973). Under the current statute, an insured may reject UM/UIM coverage under § 10–4–609(1), 4A C.R.S. (1987).

The *Newton* court held that the Nationwide set-off clause would eliminate completely the insurer's liability under the uninsured motorist coverage, and that "[s]uch a set-off clause is repugnant to the state's public policy requiring uninsured motorist coverage to be provided in at least the stated minimum amounts." *Id.*, 594 P.2d at 1044.

We also found in *Newton* that allowing the Nationwide set-off clause would violate the legislature's express purpose in enacting the uninsured motorist statute: " 'to *induce and encourage* all motorists to provide for their financial responsibility for the protection of others[,] and to assure the widespread availability to the insuring public of insurance protection against the financial loss caused by negligent financially irresponsible motorists.' " *Id.*, 594 P.2d at 1045 (*quoting* § 10–4–320, 4 C.R.S. (1973)); *see* § 42–7–102, 17 C.R.S. (1973).

Furthermore, *Newton* posited that "the reduction of uninsured motorist coverage by PIP amounts paid or payable actually penalizes those who are m[o]re seriously injured for as the PIP benefits increase, the amounts recoverable under uninsured motorist coverage decrease." *Newton,* 197 Colo. at 467, 594 P.2d at 1045. The *Newton* court found that such a result contravenes the purpose of the No Fault Act to "provide greater insurance protection for the more seriously injured accident victims while eliminating over-payments to less seriously injured claimants." *Id.* We stated that, as a matter of public policy, insurers should be required to "disclose fully and fairly to the purchasing public what insurance protection is actually being provided for the premium charged." *Id.*

■ We agree with the rationale of *Newton* that insurers may not absolve their liability under UM/UIM provisions by reducing the amount of UM/UIM coverage they contracted to provide by payments received for separate and distinct insurance benefits. As in *Newton,* the subsection (3) set-off clause at issue here could eliminate entirely American Family's liability under the UM/UIM coverage. Allowing American Family to receive such a windfall at the expense of Barnett undermines the purpose of UM/UIM coverage.[4]

The present case differs from *Newton* in that it is unclear whether the subsection (3) set-off clause would reduce Barnett's UM/UIM coverage below the statutorily required minimum. We find, however, that our holding in *Newton* should be expanded as a result of subsequent amendments to the uninsured motorist statute and this court's holding in *Kral,* 784 P.2d at 765.

In 1983, the uninsured motorist statute was amended to require insurers to offer insureds higher UM/UIM policy limits. The statute provides:

> Prior to the time the policy is issued or renewed, the insurer shall offer the named insured the right to obtain higher limits of uninsured motorist coverage in accordance with its rating plan and rules, but in no event shall the insurer be required to provide limits higher than the insured's bodily injury liability limits or one hundred thousand dollars per person and three hundred thousand dollars per accident, whichever is less.

Act approved May 4, 1983, ch. 92, sec. 1, 1983 Colo.Sess.Laws 454; § 10–4–609(2), 4A C.R.S. (1987). In *Parfrey v. Allstate Insurance Co.,* 815 P.2d 959 (Colo.App. 1991), *aff'd,* 830 P.2d 905 (Colo.1992), the court of appeals held that the "statute imposes a duty upon insurers to offer UM/

---

4. Conversely, subsection (1) of the Limits of Liability section of the American Family policy, which provides for the set-off of payments made by "the owner or operator of the uninsured motor vehicle or organization which may be legally liable," does not violate public policy because both UM/UIM benefits and payments by the uninsured/underinsured motorist serve the same purpose of "protection against finan- cial loss caused by negligent and financially irresponsible motorists." § 42–7–102, 17 C.R.S. (1984). Therefore, the set-off of Barnett's $50,- 000 settlement with Minson does not reduce the total amount of $100,000 available to compensate Barnett for the financial loss she incurred as a result of an accident with an underinsured motorist.

UIM optional coverage in definite and specific terms so as to allow the consumer to make an intelligent decision regarding whether to accept or reject this coverage." *Parfrey*, 815 P.2d at 962. The *Parfrey* court emphasized that, under section 10–4–609(3), 4A C.R.S. (1987), the selection of policy limits is to be made by the insured, and that, under section 10–4–609(2), the insurer is required to offer the insured the option of higher coverage. *Id.* at 962, 963.

The General Assembly's decision to require insurers to offer $100,000 in UM/UIM coverage, and our reaffirmation of this obligation in *Parfrey*, are significant because they mandate that $100,000 in UM/UIM coverage shall be available to an insured who elects to pay the additional premium for such coverage. An individual who pays for increased coverage should receive the additional benefits which the insurer agreed to provide. There is no incentive for an individual to purchase $100,000 in UM/UIM coverage if the insurer is only obligated to pay $25,000 in benefits.

We held in *Kral:*

> The rationale of *Newton* supports our conclusion that the General Assembly intended uninsured motorist coverage to provide an insured with benefits to the extent necessary to recover for loss caused by a negligent and financially irresponsible motorist, *subject to policy limits.*

*Kral*, 784 P.2d at 765 (emphasis added). In *Kral*, we expanded upon our holding in *Newton* by shifting the focus from statutory minimums to recovery within policy limits.

In this case, American Family offered Barnett increased UM/UIM coverage of $100,000 per person and $300,000 per accident. Barnett accepted this offer and, accordingly, paid a higher premium for the additional coverage. Barnett's $100,000 UM/UIM coverage has already been set off by the $50,000 settlement with Minson. American Family argues that the set-off of Barnett's SSDI benefits against her remaining available UM/UIM benefits would not contravene public policy because Barnett is already recovering twice the statutory minimum by virtue of her $50,000 settlement with Minson. *See* § 42–7–103, 17 C.R.S. (1984). On the contrary, we conclude that allowing American Family to further reduce Barnett's contract for UM/UIM coverage by the amount of her SSDI benefits would contravene the public policies of providing full recovery within policy limits, and placing "an injured party having uninsured motorist coverage in the same position as if the uninsured motorist had been insured." *Kral*, 784 P.2d at 764; *see Newton*, 197 Colo. 462, 594 P.2d 1042; *see also* § 42–7–102.

American Family argues that, if Barnett's SSDI benefits are not set off, she will receive duplicative benefits. This court has expressed concern regarding the prospect of granting an insured windfall profits by allowing double recovery for the same loss. *Alliance Mut. Casualty Co. v. Duerson*, 184 Colo. 117, 518 P.2d 1177 (1974); *Newton*, 197 Colo. 462, 594 P.2d 1042; *Kral*, 784 P.2d 759. In *Duerson*, we held that the uninsured motorist statute does not contemplate double recovery. *Duerson*, 518 P.2d at 1181. In *Newton*, however, we found that an overlap of benefits is distinguishable from double recovery. *Newton*, 197 Colo. at 465–66, 594 P.2d at 1043–44. In refusing to set off PIP benefits from the available uninsured motorist coverage, the *Newton* court found that, although an overlap of benefits existed, double recovery would not result because:

> [t]he minimum benefits required to be covered by PIP include medical expenses, rehabilitation and occupational training costs, lost wages, and, to some extent, loss of essential services that the injured person would have performed without being paid. In contrast, uninsured motorist coverage compensates for *any loss* arising from bodily injury or death up to the policy limits.

*Id.* (footnotes omitted).[5]

The present case is similar in that the SSDI and UM/UIM benefits "overlap to some extent but are not duplicative." *Id.* The SSDI benefits are designed to compensate an insured for a loss of *income* resulting from a disability, while UM/UIM coverage compensates the insured for *"any loss arising from bodily injury or death up to the policy limits."* *Id.* As in the case of PIP benefits, we find that setting off SSDI benefits against UM/UIM benefits violates public policy. Accordingly, we find that the American Family subsection (3) set-off clause is void in this case, with respect to the set-off of SSDI benefits, and that American Family may not set off Barnett's SSDI benefits against the UM/UIM award.

## C.

The Barnetts argue that the subsection (3) set-off clause of the insurance policy is either ambiguous or unconscionable. We do not need to reach this issue because we find that the subsection (3) set-off clause is void in contravention of public policy. *See Newton,* 197 Colo. 462, 594 P.2d 1042; *Kral,* 784 P.2d 759.

## III.

■ American Family argues that Barnett's SSDI benefits should be set off under the collateral source statute, section 13–21–111.6, 6A C.R.S. (1987).

We find that Barnett's SSDI benefits should not be set off from the UM/UIM award under section 13–21–111.6 because that section specifically excludes "a contract entered into and paid for by or on behalf of [the injured party]." § 13–21–

111.6; *see Van Waters & Rogers, Inc. v. Keelan,* 840 P.2d 1070, 1078–79 (Colo.1992).

In *Keelan,* we held that disability benefits payable to a firefighter under a pension plan fell within the exception to the collateral source statute and, therefore, could not be set off. In that case, the State of Colorado made contributions to the pension plan in exchange for the firefighter's services. We found in *Keelan* that the legislature intended to include disability benefits and Social Security benefits in the exception to the collateral source statute. *Keelan,* at 1077, 1078. We stated:

> The legislative discussions, however, evince an intent that other types of benefits, such as "individually held disability and life insurance, social security benefits, death benefits, and maybe some unemployment benefits" also be excluded. *See* statement by Senator Hefley [Tape recording of testimony before the Senate Business and Labor Committee on Senate Bill 67, February 18 and 19, 1986, 55th General Assembly].

*Keelan,* at 1079.

Like the pension benefits at issue in *Keelan,* the SSDI benefits which Barnett is entitled to receive are based upon payments made by or on behalf of the injured party. Barnett's SSDI benefits are the result of payments made under a contributory insurance system, rather than gratuities or public assistance. *See Sciarotta v. Bowen,* 735 F.Supp. 148, 151 (D.N.J.1989) ("The disability insurance program, like the other insurance aspects of the Social Security Act, is contributory in nature, and is designed to prevent public dependency by protecting workers and their families against common economic hazards, wholly

**5.** We further suggested the following procedure in *Newton* to prevent double recovery of PIP and UM benefits:

> The proper method to preclude the possibility of recovery of PIP-type losses under both PIP and uninsured motorist coverages would be to eliminate PIP paid benefits from the uninsured motorist *claim,* then allow recovery of the uninsured motorist benefits to the extent non-PIP benefits are proved, up to the

policy limits. This procedure would preclude actual double recovery of no-fault benefits while allowing the insured the full protection of the uninsured motorist coverage for which he paid a premium. Moreover such a procedure would prevent the insurer from reducing uninsured motorist coverage below the statutory minimums.

197 Colo. at 468, 594 P.2d at 1046.

without regard to the need of the recipient."); *see also Haberman v. Finch,* 418 F.2d 664, 667 (2d Cir.1969); *Gold v. Secretary of Health Educ. and Welfare,* 463 F.2d 38, 41 (2d Cir.1972); *Collins v. Celebrezze,* 250 F.Supp. 37, 43 (S.D.N.Y.1966); *Schmiedigen v. Celebrezze,* 245 F.Supp. 825, 827 (D.D.C.1965).

SSDI benefits represent money earned and contributed through the efforts of a working individual, parent, or spouse, and such payments, like proceeds on an insurance policy, substitute as income to the disabled worker or the worker's family. *See In re Marriage of Meek,* 669 P.2d 628, 630 (Colo.App.1983); *Schmiedigen,* 245 F.Supp. at 827. The court in *Schmiedigen* held:

> [T]he law created a contributory insurance system, under which what in effect constitute premiums are shared by employees and employers. Consequently, in spirit at least, if not strictly and technically, the employee, who throughout his working life has contributed part of the premiums in the form of deductions from his wages or salary, should be deemed to have a vested right to the payments prescribed by the statutory scheme, which in effect comprises the terms of his insurance policy. He has earned the benefits; he is not receiving a gift.

*Id.*

In order to receive SSDI benefits, an individual must meet the statutory requirements of eligibility. Accordingly, an individual who is insured for disability insurance benefits, has not attained retirement age as defined by the Act, has filed an application for disability insurance benefits, and is under a disability as defined by the Act, is entitled to disability insurance benefits. 42 U.S.C. § 423 (1988). One of the elements necessary to be "insured" for the purpose of receiving disability benefits is

that an individual must have earned no less than twenty quarters of coverage in a specified forty-quarter period with respect to earnings on which Social Security taxes were payable. 42 U.S.C. § 423(c)(1) (1988).[6]

In the present case, an administrative law judge determined that Barnett met the earnings requirements of the Act, as well as the Act's other disability insured status requirements, and was eligible to receive SSDI benefits. In *Keelan,* we determined that the exception to the collateral source statute is broad enough to preclude the set-off of such SSDI benefits. Therefore, we conclude that Barnett's SSDI benefits fall within the exception to section 13–21–111.6, and, consequently, may not be offset from the benefits she is entitled to receive under her UM/UIM policy.

Based upon the foregoing analysis, we reverse and remand for further proceedings consistent with this opinion.

ROVIRA, C.J., and QUINN, J., dissent.

Chief Justice ROVIRA dissenting:

The majority holds that one clause of the limits of liability provision contained in the policy issued by American Family Mutual Insurance Company ("American Family") is void and thus, American Family may not set off Gale Barnett's Social Security Disability Insurance ("SSDI") benefits against the uninsured/underinsured motorist ("UM/UIM") award. Maj. op. at 1309. The majority also holds that the collateral source statute is inapplicable to this case. Maj. op. at 1309–10. I dissent.

## I

Gale Barnett was injured when the car she was riding in was struck by a vehicle operated by Robert Scott Minson. Minson was an underinsured motorist driving a car

---

6. Unlike the sections of the Social Security Act which apply to Barnett, the Act also provides financial assistance for needy aged, blind, and disabled individuals under the supplemental security income program. 42 U.S.C. §§ 1381– 1383(d) (1988). These benefits, however, are entirely separate from SSDI benefits, are provided for under a different subchapter of the Act, and do not apply to Barnett.

owned by Lulubelle Morton. As a result of these injuries, Gale Barnett was unable to continue working and thus, filed an application for SSDI benefits. On September 22, 1988, an Administrative Law Judge ruled that Gale Barnett was disabled and awarded her SSDI benefits. The Barnetts also initiated a personal injury lawsuit against Minson which resulted in a settlement of $50,000—the liability limit under Morton's casualty policy.

The Barnetts gave American Family notice they would be initiating a claim for underinsured motorist benefits under the policy they had contracted for with American Family. The Barnetts' policy provided UM/UIM coverage for bodily injury for a maximum amount of $100,000 for each person and a maximum amount of $300,000 for each accident. American Family then filed a declaratory judgment action seeking a determination of whether the SSDI benefits could be set off from the underinsured motorist benefits otherwise available to Gale Barnett. The Barnetts did not dispute American Family's contention that the $50,000 settlement with Minson could be set off from the $100,000 ceiling for UM/UIM coverage—leaving a maximum possible recovery of $50,000 under the UM/UIM provision. Thus, the precise question before us is whether American Family may further reduce Gale Barnett's UM/UIM coverage from the already reduced $50,000 ceiling.

## II

The limits of liability provision contained in the American Family policy issued to the Barnetts provides, in pertinent part, that

[a]ny amounts payable will be reduced by:

1. A payment made by the owner or operator of the uninsured motor vehicle or organization which may be legally liable.

2. A payment under the Liability coverage of this policy.

3. A payment made or amount payable because of bodily injury under any workers' compensation or disability benefits law or any similar law.

(Emphasis omitted.) The majority finds only a portion of subsection 3 to be unenforceable and void as contrary to "public policy." More specifically, the majority holds unenforceable the clause pertaining to disability benefits. I am not convinced, however, that any of the public policies identified by the majority in fact support a finding that subsection 3's disability clause is void and unenforceable in this case.

### A

In *Newton v. Nationwide Mutual Fire Insurance Co.*, 197 Colo. 462, 594 P.2d 1042 (1979), we held that "[b]ecause the [set-off] provision purports to allow an insurance carrier to provide less than the statutorily required minimum coverage of uninsured motorist coverage ... it is contrary to the legislative intent [of the statute].... Thus the provision is invalid and unenforceable." *Id.* at 465, 594 P.2d at 1043. After reiterating the bases of our decision in *Newton*, the majority concludes that *Newton* should be expanded to cases in which enforcement of a set-off provision may not result in lowering the amount of UM/UIM coverage below the statutorily required minimum. Maj. op. at 1307. This expansion of *Newton* is warranted, the majority argues, on the basis of "subsequent amendments to the uninsured motorist statute and this court's holding in *Kral* ...." *Id.* I am of the opinion that the rationales offered by the majority in support of its expansion of *Newton* do not justify such a holding. Rather, I would hold at the very least, that *Newton* should be limited to circumstances where a set off against UM/UIM coverage would result in coverage below the statutorily required minimum.

### B

The majority first asserts that subsection 3's disability clause is void and unenforceable because it violates the public policy that

UM/UIM coverage "provide an insured with benefits to the extent necessary to recover for loss caused by a negligent and financially irresponsible motorist, subject to policy limits." Maj. op. at 1305 (citing *Kral v. American Hardware Mut. Ins. Co.*, 784 P.2d 759 (Colo.1989)). I fail to see how this public policy can support the majority's holding in this case in light of the fact that at present, there has been no final determination of the extent of Barnett's losses resulting from the auto accident. Consequently, it is pure speculation for this court to assert that a set off of SSDI benefits would violate the public policy of providing benefits that are adequate to cover the losses caused by an uninsured or underinsured motorist. Therefore, this public policy cannot support the majority's holding in this case.

The majority next argues that enforcing the disability set-off provision would violate public policy because "[a]llowing American Family to receive such a windfall at the expense of Barnett undermines the purpose of UM/UIM coverage." Maj. op. at 1307. Irrespective of which public policy the majority is referring to, I disagree with the majority's characterization that enforcing the SSDI set-off provision would result in a "windfall" to American Family. The cost of purchasing the type of UM/UIM coverage the Barnetts obtained surely reflects the fact that exposure to liability on the part of American Family is narrowed by the limits of liability provision contained in the policy. Conversely, economic reality would dictate that if the Barnetts purchased UM/UIM coverage subject to absolutely no limits of liability, they would have paid a significantly higher premium for such broad coverage. Consequently, it is entirely misleading to characterize enforcement of the disability set-off as a windfall to American Family. I prefer to characterize the enforcement of this provision and its consequences with the truism; "you get what you pay for."

In any event, I fail to see the logic in asserting, on the one hand, that the set off of SSDI benefits results in a "windfall" to American Family and thus, is contrary to public policy and holding, on the other hand, that the $50,000 set off for the Minson settlement is not contrary to public policy. How can the "savings" enjoyed by American Family resulting from the set off of SSDI benefits result in a windfall, but not the $50,000 "savings" resulting from the Minson settlement. Clearly if the enforcement of one set-off results in a windfall, so too must the other.

The majority, however, does not attempt to explain the distinction between the two as they relate to avoiding a "windfall" to American Family. Rather, it is held that the Minson set off does not violate public policy "because both UM/UIM benefits and payments by the uninsured/underinsured motorist serve the same purpose of 'protection against financial loss caused by negligent and financially irresponsible motorists.'" Maj. op. at 1309 n. 5. I have already expressed my view as to why, given the posture of this case, invocation of this public policy is based on pure speculation and thus, cannot be said to support the majority's holding. With respect to adequate coverage for loss, the speculation pertains to whether or not Barnett's losses will prove to be in excess of the amount of coverage provided under the American Family policy after coverage is set off for the Minson settlement and, hypothetically, the SSDI benefits. Invocation of this public policy in the context of the Minson set-off is similarly speculative since Barnett's losses may be determined to be in excess of $100,000. Assume, for example, that Barnett's losses are determined to be $150,000. Under those circumstances, the $50,000 Minson set-off could not be seen as promoting the public policy of adequate coverage for loss because the set off under those circumstances would result in a coverage shortfall of $50,000. Consequently, a determination that the Minson set-off is permissible because it is consistent with the public policy of protection against financial loss is based entirely on speculation and thus, lends no support to the majority's holding here.

Next, the majority argues that the 1983 amendments to the uninsured motorist act supports the expansion of *Newton*. Maj. op. at 1307–08. The 1983 amendments increased the statutory minimum coverage that insurers must offer to $100,000. *See* § 10–4–609(2), 4A C.R.S. (1987). It is correctly noted by the majority that this amendment "mandate[s] that $100,000 in UM/UIM coverage shall be available to an insured individual who elects to pay the additional premium for such coverage." Maj. op. at 1308. I am at a complete loss as to why such an increase warrants expanding *Newton* to cases where a set off would not result in coverage below the statutory minimum. It is my opinion that this increase reflects nothing more than the General Assembly's determination that motorists in Colorado should be provided the opportunity to purchase UM/UIM coverage which will more likely cover the losses incurred as a result of accidents with uninsured or underinsured motorists. Such an assessment on the part of the General Assembly says absolutely nothing, however, regarding the question whether set-off provisions as applied to UM/UIM coverage violate "public policy."

The majority next cites to *Parfrey v. Allstate Insurance Co.*, 815 P.2d 959 (Colo. App.1991), in support of expanding *Newton*. The majority notes that the *Parfrey* court held the "statute imposes a duty upon insurers to offer UM/UIM coverage in definite and specific terms so as to allow the consumer to make an intelligent decision regarding whether to accept or reject this coverage." Maj. op. at 1307–08 (citing *Parfrey*, 815 P.2d at 962). I do not dispute that the statute imposes such duties on insurers. As with the 1983 amendments, however, I fail to see the relevance this observation has to the question whether *Newton* should be expanded to cases where enforcement of a set-off provision will not result in coverage below the statutorily mandated minimum.

The Barnetts purchased UM/UIM coverage from American Family. Consequently, American Family clearly fulfilled its duty to offer such coverage to the Barnetts. Furthermore, it has neither been alleged nor determined that the American Family policy issued to the Barnetts is ambiguous. Thus, there is no reason to assume that American Family has not also fulfilled its duty to offer coverage in "definite and specific terms." Similarly, there is no evidence to suggest that the Barnetts entered into this agreement based on a misunderstanding regarding what sort of coverage they were purchasing. Consequently, there is no reason to assume that American Family has not also fulfilled its duty "to allow the consumer to make an intelligent decision regarding whether to accept or reject this coverage." More important than the question of whether American Family fulfilled the duties imposed on it by the uninsured motorist statute, however, is the question of what such duties have to do with the propriety of expanding *Newton*.

Finally, the majority argues that our holding in *Kral v. American Hardware Mutual Insurance Co.*, 784 P.2d 759 (Colo. 1989), also supports the expansion of *Newton*. The majority argues that in *Kral*, we shifted our focus from set-off provisions which would reduce UM/UIM coverage below the statutorily required minimum to full recovery within policy limits. Thus, relying on *Kral*, the majority concludes that "allowing American Family to further reduce Gale Barnett's contract for UM/UIM coverage by the amount of her SSDI benefits would contravene the public policies of providing full recovery within policy limits, and placing 'an insured party having uninsured motorist coverage in the same position as if the uninsured motorist had been insured.'" Maj. op. at 1308. This public policy rationale is closely related to the majority's observation that the 1983 amendments evince an intent on the part of the General Assembly that "[a]n individual who pays for increased coverage should receive the additional benefits which the insurer agreed to provide." Maj. op. at 1308. In short, the public policies of "full recovery within policy limits" as expressed

in *Kral* and the notion that an insured should "receive the additional benefits which the insurer agreed to provide" represented by the 1983 amendments render the disability set-off clause unenforceable.

There are two reasons why the shift in emphasis represented in *Kral* and the public policy identified in the 1983 amendments cannot support the majority's holding here. First, I can find no support for the argument, implicit in the majority's reasoning, that the limits on recovery under an insurance policy are the same thing as the numerical figures that might appear in isolated policy provisions. That is to say, simply because the policy purchased by the Barnetts provides for "$100,000" UM/UIM coverage in one provision, it can hardly be said that this figure constitutes the only limit on recovery under such a policy or, that it represents the amount of coverage the insurer is obligated to provide. Rather, insurance contracts must be read as a whole in order to properly determine how relevant, complementary, and mutually related provisions impact one another. *Kuta v. Joint Dist. No. 50 (J) of Counties of Delta, Gunnison, Mesa & Montrose*, 799 P.2d 379 (Colo.1990) (meaning of contract is found by examination of entire instrument and not by viewing clauses or phrases in isolation). In so doing, any provisions which expressly limit liability must clearly be regarded as relevant in determining what the actual policy limits are and what the insurer has agreed to provide.

To determine policy limits and an insurer's obligations based solely on the maximum allowable recovery—that is, when no limits of liability are considered applicable or, when provisions are read in isolation—is to turn a blind eye both to the intent of the contracting parties in addition to well-settled rules of contract interpretation. Moreover, identifying a public policy which seeks to allow "recovery within policy limits" or holding an insurer to its obligations has absolutely no bearing on the question whether set-off provisions run contrary to such policies. This is so because policy limits and an insurer's obligations are defined, in part, by reference to and application of set-off provisions themselves.

Second, and perhaps more importantly, even if I were to accept the majority's conception of "full recovery within policy limits"—*i.e.*, $100,000 under the Barnetts' policy—it is impossible for this "public policy" to be served here. American Family and the Barnetts agree that the $50,000 Minson settlement can be set off against the $100,000 ceiling for UM/UIM coverage. Because this set off is not disputed and thus, not an issue before this court, "full recovery within policy limits" (as understood by the majority) cannot be achieved in the present case because the parties only dispute the applicability of limits of liability as they relate to coverage which has already been reduced by 50% of the maximum possible coverage. In short, the parties to this action have already rendered "full recovery within policy limits" an impossibility. Thus, this court is incapable of rendering a decision which would effectuate the public policy which is purportedly served by the majority's holding.

In sum, I am of the opinion that the authority relied on by the majority in support of its expansion of *Newton* is either irrelevant or based on pure speculation as it relates to the question whether *Newton* should be expanded to circumstances in which the application of set-off provisions might not result in UM/UIM coverage below the statutorily mandated minimum.

### III

Finally, for the reasons stated in Justice Quinn's dissenting opinion, I disagree with the majority's holding that the collateral source statute is inapplicable to this case.

Therefore, I respectfully dissent.

Justice QUINN dissenting:

I am of the view that the court of appeals correctly determined that the set-off provision of American Family's insurance

policy does not violate any public policy of this state. In contrast to the court of appeals, however, I would remand this case to the trial court to determine whether any part of the compensation payable to Gale F. Barnett as social security disability insurance (SSDI) benefits would also be included within the uninsured/underinsured (UM/UIM) motorist coverage of the American Family policy.

I agree with much of Chief Justice Rovira's dissent on whether the set-off provision of the policy issued to the Barnetts violates the public policy of this state. If there is a demonstrable public policy with respect to a set-off against a tort award for benefits paid from another source for the same elements of damages, it would appear to be a policy that, with some limited exceptions, disallows a double recovery for the same injury. For example, section 10–4–707(5), 4A C.R.S. (1987), requires that insurance coverage for personal injury protection (PIP) benefits be reduced to the extent that the same benefits are covered under the Colorado Workers' Compensation Act. In similar fashion, section 10–4–713(1), 4A C.R.S. (1987), deprives a person eligible for PIP benefits of the right to recover the same benefits against the owner, user, or operator of a motor vehicle legally responsible for the claimant's damages. Finally, again by way of example, section 13–21–111.6, 6A C.R.S. (1987), requires the court to reduce a verdict for tort damages by the amount by which the plaintiff has been wholly or partially indemnified or compensated for his or her loss by some other person, entity, or fund. If these types of set-offs do not offend public policy—and I have no reason to believe that they do, *cf. Tate v. Industrial Claim Appeals Office*, 815 P.2d 15, 19 (Colo.1991)—there is no reason to invalidate the set-off of social security disability insurance (SSDI) benefits against a tort award as contrary to the public policy underlying UM/UIM coverage so long as the following two conditions are present: (1) the SSDI benefits are paid to the tort claimant as compensation for the same elements of damages covered by UM/UIM insurance; and (2) the set-off would not reduce the amount payable under UM/UIM coverage to a level below the minimum statutory requirements of $25,000 per person and $50,000 per accident. §§ 10–4–609(1), 4A C.R.S. (1987) and 42–7–103(2), 17 C.R.S. (1984). When these two conditions are satisfied, the set-off of SSDI benefits becomes nothing more than a permissible method of coordinating state mandated UM/UIM coverage and federally mandated SSDI benefits for the purpose of avoiding a double recovery by a tort claimant.

To be sure, section 13–21–111.6 creates an exception to the statutory set-off in the case of collateral benefits paid "as a result of a contract entered into and paid for by or on behalf of [the claimant]." The SSDI benefits paid to Gale Barnett, however, do not qualify for this statutory exception because such benefits were not paid to her as the result of some employment contract between her and her employer, *see generally Van Waters & Rogers, Inc. v. Keelan*, 840 P.2d 1070, 1078 (Colo.1992), but, rather, were awarded to her as the result of a federal statutory scheme funded by a tax assessed against employers and employees. *See* 26 U.S.C. §§ 3101 and 3111 (1988). The compulsory nature of the federal tax, in my view, is antithetical to the contractual exception contemplated by section 13–21–111.6.

The record in this case does not permit a determination of whether the SSDI benefits paid to the Barnetts would be duplicative of UM/UIM coverage. I accordingly would return this case to the trial court for a resolution of that question under the standard developed in *Newton v. Nationwide Mutual Fire Ins. Co.*, 197 Colo. 462, 594 P.2d 1042 (1979). Under *Newton*, the trial court should allow recovery by Gale F. Barnett of all proven elements of damages not covered by SSDI benefits up to the available limit of UM/UIM coverage (i.e., the $100,000 limit minus the $50,000 already received by the Barnetts in the Minson settlement). Any of Gale Barnett's

elements of damages for which she was or is being indemnified by SSDI benefits should be disallowed, and any elements of damages not so indemnified by SSDI benefits should be permitted. This procedure, consistent with our opinion in *Newton*, will preclude the double recovery of the same benefits, will provide Gale Barnett with a $100,000 limit of UM/UIM coverage for which a premium has been paid with respect to those elements of damages for which she has not been indemnified by SSDI benefits, and will prevent the insurer from reducing UM/UIM coverage below the statutory minimum of $25,000 per person and $50,000 per accident. *Newton*, 197 Colo. at 468, 594 P.2d at 1046.

I, therefore, would affirm that part of the court of appeals' judgment which holds that the set-off provision of the American Family insurance policy does not violate the public policy of this state, but I would remand the case to the trial court for the purpose of determining whether any part of the UM coverage available to Gale Barnett will or will not be duplicative of the SSDI benefits awarded to her.